RAND ROSENZWEIG
  RADLEY & GORDON, LLP
Charles L. Rosenzweig [CR 7622]
Michèle L. Kugler [MK 3824]
Attorneys for Plaintiff
800 Third Avenue, 26th Floor
New York, New York 10022
(212) 687-7070



FILED
JAN 1 1 2006
USDC WP SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X   CASE NO. 06 CV _____ ( )

CHARLES M. HALLINAN

                              Plaintiff,                                   COMPLAINT

                    -against-

REPUBLIC BANK & TRUST COMPANY                          '06 CIV 00185

                              Defendant.

--------------------------------------------------------------X

                                                                        JUDGE BAER

## COMPLAINT

Plaintiff Charles M. Hallinan ("Hallinan") commences this action to recover damages caused by the fraudulent misrepresentations made by the Defendant Republic Bank & Trust Company ("Republic"). To induce Hallinan to invest in Benefits Express, LLC ("Benefits"), which had a business relationship and was in debt to Republic, Republic falsely represented that it would meet several conditions necessary for Hallinan's involvement. Republic made these representations with the full knowledge and intention that these conditions would not be met. After Hallinan made his investments, Republic engineered a forced takeover of Benefits, and usurped Hallinan's

entire investment. Republic engineered this forced takeover in order to steal Benefits' clients for Republic's own fledgling operation. Republic's conduct, as more fully described below, is without any justification whatsoever and is so outrageous and recklessly indifferent to Hallinan's rights as to entitle Hallinan to punitive damages in addition to the over $350,000 sought in compensatory damages.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Charles M. Hallinan is an adult individual with a home address at 400 Southeast Fifth Avenue, Apartment 304 N, Boca Raton, Florida.

2.      Defendant Republic Bank & Trust Company is a Kentucky state chartered commercial banking corporation with a principal office located at 601 West Market Street, Louisville, KY 40402.

3.      This Court has jurisdiction over this matter in that the plaintiff and defendant are citizens and residents of different states, and the amount in controversy, exclusive of interest and costs, exceeds $350,000.

4.      Venue is appropriate in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391 in that Republic regularly transacts business in this judicial district and the events and conduct that gives rise to Hallinan's claims occurred within this judicial district.

## THE BENEFITS – REPUBLIC CONTRACT

5.      Benefits began operations in 1995. Benefits and its principals, Barry Kessler ("Kessler") and Steve Cusumano ("Cusumano"), devised a way to offer

direct deposit services to the "unbanked," or underserved persons who were previously unable, for one reason or another, to set up a checking account with a bank.

6.      Benefits' principal place of business was located in the Empire State Building, 350 Fifth Avenue, Suite 547, New York, New York 10118.

7.      Benefits created a program called "Direct Deposit Plus" ("DDP"), through which Benefits was able to contract with various independent brick and mortar check cashing stores, which would in turn offer Benefits' services.  Once a brick and mortar store became a licensed agent of Benefits, Benefits would provide software to the store.  The store would then enroll willing customers in the DDP Program.

8.      Once the customer enrolled in the DDP Program, the customer would authorize Benefits to set up a direct deposit account for the customer's government benefit check.  Thereafter, the customer's check would be deposited directly into the account that Benefits set up.  Once the direct deposit was effectuated, the brick and mortar store would be able to cut the customer a check for the amount of the deposit, less a fee to Benefits.

9.      The advantages of the DDP Program for the customer were that it enabled the customer to have faster and easier access to his money, and the direct deposit eliminated the risk that the check would get lost in the mail, stolen or misplaced.

10.      To implement the DDP Program, Benefits needed a relationship with a bank to maintain the accounts through which the deposits would flow.

11.     Initially, Benefits ran its DDP Program through Bank One.  When that relationship ended, Benefits sought a relationship with Republic.

12.     In 1998, Republic operated a program known as "Refunds Now." Through "Refunds Now," Republic established and maintained deposit accounts for the purpose of receiving customers' tax refunds.  Once the tax refunds were deposited, Republic would disburse those funds through licensed agents, usually brick and mortar check cashing locations.

13.     On or about November 28, 1998, Republic and Benefits entered into a contract (the "Benefits – Republic Contract"), through which Republic agreed to participate in the DDP Program.

14.     In early 2000, Benefits established a new product, a debit card program ("DCP").  Under the DCP, a customer would receive an ATM card that would enable the customer to make cash withdrawals from ATM machines or make point-of-sale purchases with the money that was direct-deposited, eliminating the need for customers to travel to the brick and mortar location to withdraw money.

15.     Later that year, Benefits established an optional overdraft feature (the "Overdraft Program") in conjunction with the DCP.  The Overdraft Program permitted the customer to use ATM machines or point of sale purchases to withdraw up to $200 more than the customer had in his account.  The customer would then be assessed a fee for the overdraft ("Overdraft Fees").

16.    Prior to November 2001, Benefits and Republic did not have in place any operating agreement or contract stating how the Overdraft Program would work, the division of fees between Benefits and Republic, and the obligations of both parties.

17.    After the Overdraft Program was implemented, Republic paid to Benefits 42% of the Overdraft Fees, and retained 58% of the Overdraft Fees for itself.

18.    Also, although Overdraft Fees were being collected each day, Republic held on to the Overdraft Fees for approximately two and one-half months prior to transferring the money to Benefits.

19.    Further, Republic would regularly analyze the accounts in the Overdraft Program to identify accounts that (potentially) could become dormant or delinquent.    Based on Republic's analysis, Republic would deduct 42% of these "projected chargeoffs" from the gross Overdraft Fees.

## HALLINAN IS INDUCED TO LEND MONEY TO BENEFITS

20.    In 2001, due to the two and one-half month delay in paying the Overdraft Fees, the 42%/58% split of Overdraft Fees initially utilized by Republic, the excessive projected chargeoffs, as well as other issues, Benefits realized a shortfall in its overdraft account with Republic.    This shortfall totaled approximately $160,000.

21.    Republic advised Kessler that Benefits would need to pay the $160,000 shortfall immediately.

22.     Hallinan is an investor with experience in businesses serving the unbanked or underserved communities.

23.     Kessler asked Hallinan to invest in Benefits and cover the shortfall.

24.     Hallinan then attended a series of conference calls and meetings with Kessler and representatives of Republic, including Michael Keene ("Keene") and William Petter ("Petter").   These conference calls and meetings will be collectively referred to as the "Shortfall Meetings."

25.     During the Shortfall Meetings, Keene and Petter explained to Hallinan that Republic wanted the shortfall paid immediately.

26.     Hallinan then explained to Keene and Petter during the Shortfall Meetings that he would be unwilling to invest in Benefits unless Republic changed the 58%/42% division of Overdraft Fees, and also made other changes to the Overdraft Program.  Hallinan advised that the 58%/42% division, and other aspects of the Overdraft Program, were not consistent with industry practice.   Indeed, Hallinan advised that he was able to earn 90% in other similar business ventures, and therefore, it would not make sense for Hallinan to invest in Benefits when Benefits only received 42% of the Overdraft Fees, less projected chargeoffs.

27.     Accordingly, during the Shortfall Meetings, in order to induce Hallinan to invest in Benefits, Keene and Petter agreed to change the mechanics of the Overdraft Program.  Thus, Hallinan negotiated with Republic to make such changes and commit such changes to writing.

28.     Specifically, in order to induce Hallinan to invest in Benefits, Keene and Petter stated during the Shortfall Meetings that in exchange for Hallinan's investment, Republic would pay 90% of the Overdraft Fees to Benefits.

29.     Further, in order to induce Hallinan to invest in Benefits, Keene and Petter stated during the Shortfall Meetings that they would pay Overdraft Fees to Benefits in a timely manner and eliminate the two and one-half month delay.

30.     Moreover, in order to induce Hallinan to invest in Benefits, Keene and Petter stated during the Shortfall Meetings that they were committed to working with Benefits to ensure Benefits' continued success, and to maintaining the relationship among Republic, Benefits and Hallinan.

31.     Also, during the Shortfall Meetings, Keene and Petter never mentioned that Benefits would have to maintain a 100% reserve for all overdrafts.  Upon information and belief, Republic planned to impose this condition at a later date, but did not raise this issue in the Shortfall Meetings with Hallinan, because it knew that Hallinan would never have agreed to invest in Benefits if Benefits was required to maintain a 100% reserve for all overdrafts.

32.     On or about November 15, 2001, Hallinan, Republic and Benefits entered into a contract relating to the Overdraft Program (the "Overdraft Contract").  A true and correct copy of the Overdraft Contract is attached hereto as Exhibit "A."

33.     Hallinan relied upon the representations of Keene and Petter in entering into the Overdraft Contract.  Hallinan would not have entered into the Overdraft Contract unless such representations were made by Keene and Petter.

34.     The Overdraft Contract stated that Hallinan would pay to Republic, on behalf of Benefits, $159,577.31.  This sum represented the overdraft on Benefits' account with Republic as of October 29, 2001, and an additional $9,500 in overdrafts incurred in November 2001. Ex. "A," ¶ 1.

35.     The Overdraft Contract further provided that Hallinan would fund Benefits with adequate capital as necessary for continued operation and growth. Ex. "A," ¶ 2.

36.     In return, Republic agreed to accept 10% of gross Overdraft Fees collected, and agreed to pay to Benefits 90% of gross Overdraft Fees collected. Ex. "A," ¶ 3.

37.     The Overdraft Contract also stated that Benefits would establish a reserve account with Republic to cover actual chargeoffs of principal and fees associated with customers.  In conjunction with this reserve account, Republic was to set aside 20% of the overdraft fees due to Benefits, to cover all chargeoffs. Ex. "A," ¶ 4.

38.     The Overdraft Contract further stated that Benefits "shall have the right to procure new payday advance and other revenue opportunities for Republic.  In consideration thereof, [Republic] shall pay [Benefits] TWENTY FIVE (25%) PERCENT of any revenue realized by [Republic] from any such ventures." Ex. "A," ¶ 4.

39.     In conformity with the Overdraft Contract, and in reliance on the statements of Republic's agents, Hallinan invested the $159,577.31 in Benefits, by paying the shortfall to Republic on behalf of Benefits.

40.     Altogether, in reliance on the statements of Republic's agents and the Overdraft Contract, Hallinan invested approximately $350,000 in Benefits.

41.     Also on November 15, 2001, Hallinan entered into a contract with Kessler and Cusumano. Cusumano was a 5% owner of Benefits. This contract related to the capitalization and operation of Benefits (the "Capitalization Contract"). The Capitalization Contract is attached hereto as Exhibit "B."

42.     The Capitalization Contract contemplated that Hallinan would receive a 60% interest in Benefits and another company, Payment Systems, Inc. ("Payment Systems").

43.     The Capitalization Contract also stated that the funds advanced by Hallinan on behalf of Benefits would be treated as a loan to Benefits and Payment Systems.

## REPUBLIC REFUSES TO ADHERE TO ITS OBLIGATIONS

44.     The Overdraft Contract expressly provided, *inter alia*, that Republic would (1) pay to Benefits 90% of all Overdraft Fees, (2) set aside 20% of Overdraft Fees to cover chargeoffs, and (3) work with Benefits to establish new products.

45.    Furthermore, because the Bank would be setting aside the 20% of the Overdraft Fees to cover chargeoffs, Republic agreed to pay Benefits daily, eliminating the two and one-half month delay in payment to Benefits.

46.    Benefits set up a reserve account at Republic, so that Republic could effectuate the 20% set-aside.

47.    In flagrant breach and disregard of all of their obligations, agreements, representations and promises, as described above, Republic refused to pay to Benefits 90% of all Overdraft Fees.  In fact, after the execution of the Overdraft Contract, Republic continued to pay Benefits 42% of Overdraft Fees.

48.    In addition, Republic refused to utilize the reserve account as described in the Overdraft Contract.  Instead, Republic continued to pay Benefits its 42% of Overdraft Fees two and one-half months after they were incurred; when Republic finally did pay, Republic continued to withhold excessive projected chargeoffs, just as it did prior to Hallinan's involvement.

49.    At no time did Republic ever pay to Benefits the required 90% of Overdraft Fees, and Republic never adhered to any of its other obligations under the Overdraft Contract.

## IN THE MEANTIME, REPUBLIC SETS UP A COMPETING BUSINESS

50.    Soon after Republic entered into the Overdraft Contract, Republic launched a program entitled "Currency Connection."

51.    The Currency Connection Program, which was not affiliated with Benefits, was a direct competitor to Benefits.  The Currency Connection Program offered essentially the same services as Benefits: direct deposit service, debit card service and overdraft service to underserved customers.

## REPUBLIC ENGINEERS A FORCED TAKEOVER OF BENEFITS

52.    In or about the spring of 2002, Republic unilaterally decided to impose an additional obligation upon Benefits:  Republic decided that Benefits would have to maintain a 100% reserve for all overdrafts.  In other words, Benefits would be required to maintain an account that could match, dollar for dollar, any and all overdrafts made by Benefits' customers.

53.    Benefits did not agree to the 100% reserve.

54.    In April 2003, Benefits experienced a $40,000 shortfall as a result of a bookkeeping error.

55.    In response, Republic contacted Benefits and demanded that Kessler and Cusumano sell Benefits to Republic for $200,000, a price far below Benefits' true value, and far below what Hallinan had invested in the company.

56.    Subsequent meetings were held in New York City between agents of Republic, Kessler and Cusumano.  These meetings will be referred to as the "New York Meetings."  During the New York Meetings, Republic attempted to strong-arm Kessler into selling Benefits to Republic for $200,000.

57.     Also during the New York Meetings, Republic gave Benefits no other alternative but to sell out to Republic.  Republic threatened that if Benefits did not sell to Republic, Republic would halt its involvement and all of Benefits' customers would be left without service.

58.     Republic appropriated Benefits' customer list, and Currency Connection has since utilized Benefits' customer list.

59.     Furthermore, upon information and belief, Republic had been negotiating with Cusumano to have Cusumano become an agent of Republic.

60.     On behalf of Republic, Cusumano attempted to facilitate the $200,000 sale of Benefits to Republic by endeavoring to persuade Kessler that Benefits had no other option.

61.     Soon thereafter, Cusumano started his own company, Safe Deposits, Inc.  In November 2003, Cusumano entered into an Electronic Funds Transfer and Deposit Services Agreement ("EFTDSA") with Republic, doing business as Currency Connection (the "Cusumano Agreement").   The Cusumano Agreement is attached hereto as Exhibit "C."

62.     Through the EFTDSA, Cusumano agreed to act as an Electronic Funds Issuer ("EFI") for Currency Connection.

## COUNT ONE
### Breach of Contract

63.     Hallinan incorporates by reference the foregoing paragraphs as though each paragraph were fully set forth herein.

64.     The Overdraft Contract was a valid contract.

65.     At all times material, Hallinan performed in accordance with his obligations under the Overdraft Contract.

66.     As described above, Republic breached the Overdraft Contract.

67.     As a direct result Republic's breach of contract, Hallinan has suffered substantial financial and other damages, including but not limited to the over $350,000 he invested in Benefits.

## COUNT TWO
### Fraud

68.     Hallinan incorporates by reference the foregoing paragraphs as though each paragraph were fully set forth herein.

69.     To induce Hallinan to invest in Benefits, Republic, through its agents, Keene and Petter, intentionally, knowingly and deliberately made material misrepresentations to Hallinan to the effect that Republic would (1) pay 90% of Overdraft Fees to Benefits, (2) withhold 20% of the overdraft fees to cover chargeoffs, (3) eliminate delay in payment to Benefits of the overdraft, and (4) partner with Benefits to procure new revenue opportunities.

70.     In addition, Republic deliberately withheld from Hallinan and Benefits its intent to impose a 100% reserve for all overdrafts, until after Hallinan had made his investment.

71.     These statements and omissions were made to Hallinan with the knowledge and/or intention that such acts would not occur.   Therefore, these representations were false when made, and these representations were made with the intent to induce reliance on the part of Hallinan.

72.     Hallinan justifiably and reasonably relied, to his detriment, upon the fraudulent misrepresentations and omissions made by Keene and Petter on behalf of Republic, and made an initial investment of $159,577.31.  Ultimately, Hallinan invested over $350,000 in reliance upon the representations described above.

73.     Contrary to the statements described above, Republic refused to pay 90% of overdraft fees to Benefits, refused to withhold 20% of the overdraft fees to cover chargeoffs, refused to eliminate delay in payment to Benefits of the overdraft, and refused to partner with Benefits to procure new revenue opportunities.  Instead, Republic set up its own business as a competitor to Benefits, forced Benefits to turn over its customer list, hired Cusumano, and utilized Benefits' customer list for the benefit of Currency Connection.   Also, Republic unilaterally imposed a 100% reserve for all overdrafts.

74.     As a direct result of the misrepresentations described above, Hallinan has suffered substantial financial and other damages, including but not limited to the over $350,000 he invested in Benefits.

75.     Republic's conduct was willful, wanton, outrageous and/or reckless, and Republic must be punished and deterred from continuing such conduct through an appropriate award of punitive damages.

## COUNT THREE
## Constructive Fraud

76.     Hallinan incorporates by reference the foregoing paragraphs as though each paragraph were fully set forth herein.

77.     Republic was in a dominant and superior position to Benefits and Hallinan by virtue of the fact that Benefits could not continue in existence without a bank to support the DCP Program, the Overdraft Program, and other activities.  Furthermore, Republic had superior knowledge that was not available to either Hallinan or Benefits.

78.     As described above, Republic, through its agents, Keene and Petter, made several false representations to Hallinan.

79.     As described above, Hallinan justifiably and reasonably relied, to his detriment, on the false statements made by Republic, through its agents Keene and Petter.

80.     As a direct result of the misrepresentations described above, Hallinan has suffered substantial financial and other damages, including but not limited to the over $350,000 he invested in Benefits.

## COUNT FOUR
## Negligent Misrepresentation

81.     Hallinan incorporates by reference the foregoing paragraphs as though each paragraph were fully set forth herein.

82.     The misrepresentations of Republic, as above described, alternatively constitute actionable negligent misrepresentations for which Republic is liable.

83.     Republic was in a dominant and superior position to Benefits and Hallinan by virtue of the fact that Benefits could not continue in existence without a bank to support the DCP Program, the Overdraft Program, and other activities.  Furthermore, Republic had superior knowledge that was not available to either Hallinan or Benefits. Accordingly, Republic was in a special position of trust and confidence relative to Hallinan.

84.     Due to the relationship among the parties, Republic, and its agents, Keene and Petter, had a duty to speak with care and in good faith.

85.     When Republic's agents made the statements as described above, they had knowledge that Hallinan would be relying on such representations in making his

decision as to whether he would fund Benefits and enter into the Overdraft Contract and the Capitalization Contract.   In fact, Republic's agents had specific knowledge that Hallinan would not enter into the Overdraft Contract and the Capitalization Contract unless such assurances were given by Republic.  Further, Republic's agents knew that the acts that were the subjects of the representations would not occur.

86.   As described above, Hallinan justifiably and reasonably relied, to his detriment, on the false statements made by Republic.

87.   As a direct result of the misrepresentations described above, Hallinan has suffered substantial financial and other damages, including but not limited to the over $350,000 he invested in Benefits.

88.   In addition, Republic's conduct was willful, wanton, outrageous and/or reckless.  Therefore, Republic must be punished and deterred from continuing such conduct through an appropriate award of punitive damages.

## COUNT FIVE
### Tortious Interference with Contractual Relations

89.   Hallinan incorporates by reference the foregoing paragraphs as though each paragraph were fully set forth herein.

90.   Hallinan had a valid contract with Benefits, the Capitalization Contract.

91.   Republic knew of the Capitalization Contract.

92.     As set forth above in greater detail, Republic intentionally, improperly, and without privilege or justification interfered with Hallinan's contractual relationship with Benefits, and procured the actual breach of the Capitalization Contract.

93.     Republic's interference with the Capitalization Contract was part of Republic's fraudulent scheme to misappropriate Benefits' clients once Benefits' Overdraft Program was up and running.  Republic induced Hallinan to invest in Benefits by falsely promising to pay 90% of overdraft fees to Benefits, falsely promising to withhold 20% of the overdraft fees to cover chargeoffs, falsely promising to eliminate delay in payment to Benefits of the overdraft, falsely promising to partner with Benefits to procure new revenue opportunities, and deliberately withholding from Hallinan and Benefits its intent to impose a 100% reserve for all overdrafts after Hallinan had made his investment.   Thereafter, Republic maliciously forced a takeover of Benefits and misappropriated Benefits' customer list for the benefit of Currency Connection.  This conduct effectively eviscerated Hallinan's investment in Benefits, and destroyed the fruits that Hallinan was to receive under the Capitalization Contract.

94.     As a direct and proximate result of Republic's wrongful acts, Hallinan has suffered, and will continue to suffer, substantial financial damages.

95.     Republic's conduct was willful, wanton, outrageous and/or reckless, and Republic must be punished and deterred from continuing such conduct through an appropriate award of punitive damages.

WHEREFORE, Plaintiff Charles M. Hallinan respectfully requests that judgment be entered in his favor and against Defendant, and that Plaintiff Charles M. Hallinan be awarded his costs, expenses, including reasonable attorneys' fees, punitive damages and such further relief as the Court deems just.

Dated: January 11, 2006
New York, New York

Rand Rosenzweig
Radley & Gordon, LLP
*Attorneys for Plaintiff*

Michele L. Kugler [MK 3824]
800 Third Avenue, 26th Floor
New York, New York 10022
(212) 687-7070

<u>*OF COUNSEL:*</u>
Andrew K. Stutzman
Andrew J. DeFalco
STRADLEY RONON STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA  19103-7098
(215) 564-8600

# EXHIBIT A

HALLINAN CAPITAL

The following outlines the terms of the Agreement entered into this fifteenth day of November, 2001 between Republic Bank & Trust Company (the BANK), Benefits Express, LLC (the COMPANY), and Charles M. Hallinan (HALLINAN), Barry J. Kessler (KESSLER) and Steven R. Cusumano (CUSUMANO) (collectively, the shareholders of the COMPANY).

1.  HALLINAN shall pay to the Bank on behalf of the COMPANY the sum of $159,577.31. This sum represents an estimate of the current overdraft balance in account number 53395654. This amount is calculated based on an overdraft of $150,077.31 as of October 29, 2001 plus an additional $9,500.00 in overdrafts incurred in November, 2001. The COMPANY agrees to timely satisfy any additional overdraft that may be determined by the parties to exist.

2.  HALLINAN shall fund the COMPANY with adequate capital as needed in HALLINAN'S judgment to ensure its continued operation and growth.

3.  BANK and COMPANY shall split overdraft fees collected on COMPANY'S customers' accounts. BANK shall earn TEN (10%) PERCENT of gross overdraft fees collected. COMPANY shall earn NINETY (90%) PERCENT of gross overdraft fees collected. COMPANY shall bear sole responsibility for the charge-off of principal and fees associated with the extension of overdraft to its customers. The above revenue split shall be reviewed for possible adjustment after a 120-day period.

4.  COMPANY shall establish a reserve account at the BANK. To cover actual charge-offs of principal and fees associated with customers of COMPANY, BANK shall set aside in the reserve account TWENTY (20%) PERCENT of the overdraft fees due the COMPANY. BANK shall charge the reserve account upon each instance of charge-off associated with the overdraft. The percentage outlined above shall be adjusted every six (6) months to accurately reflect true loss experience.

5.  BANK and COMPANY shall continue to split monthly and transaction fees as currently agreed upon.

6.  Effective as of this Agreement, COMPANY shall have the right to procure new payday advance and other revenue opportunities for the BANK. In consideration thereof, the BANK shall pay the COMPANY TWENTY-FIVE (25%) PERCENT of any revenue realized by the BANK from any such ventures.

7. . The parties shall update their current agreement reflecting the above understandings and other matters related to the operation of the COMPANY'S direct deposit program.

Republic Bank & Trust Company

By: _Michael B Keene_

Charles M. Hallinan

Benefits Express, LLC

By: _Todd J. Kessler, Pres._

Barry J. Kessler

Steven R. Cusumano

# EXHIBIT B

The following outlines the terms of the agreement entered into this fifteenth day of November, 2001 between Barry J. Kessler (KESSLER), Steven R. Cusumano (CUSUMANO) and Charles M. Hallinan (HALLINAN) regarding the capitalization and operation of Electronic Payment Systems, Inc. and Benefits Express, LLC (collectively, the COMPANIES).

1.  HALLINAN shall receive a SIXTY (60%) PERCENT interest in the COMPANIES in consideration for the satisfaction by HALLINAN of certain outstanding obligations of the COMPANIES to Republic Bank & Trust Company (BANK) and future unspecified capital contributions to be provided by HALLINAN to the COMPANIES as may be needed.

2.  Amounts paid by HALLINAN to Republic Bank & Trust Company (the BANK) in satisfaction of certain outstanding obligations of the COMPANIES to the BANK shall be treated as a loan to the COMPANIES.

3.  The parties shall enter into a Shareholder Agreement and other such documents as shall be required to outline the understandings of the parties respecting the ongoing business of the COMPANIES.


CHARLES M. HALLINAN          BARRY J. KESSLER          STEVEN R. CUSUMANO


BE-22

# EXHIBIT C

619

## ELECTRONIC FUNDS TRANSFER AND DEPOSIT SERVICES AGREEMENT

This Electronic Funds Transfer and Deposit Services Agreement ("Agreement") is made, entered into and effective this 7 day of _Nov_____, 20_03_ by and between Republic Bank & Trust Company d/b/a Currency Connection (RBT), a commercial bank and trust company organized under the laws of the Commonwealth of Kentucky with its primary location at 601 West Market Street, Louisville, KY, and the undersigned who wishes to become an Electronic Funds Issuer ("EFI"), subject to the terms and conditions set forth in this Agreement in accordance with the requirements of RBT's Currency Connection Check Program or Card Program collectively or individually,(" the Program").

### PRELIMINARY STATEMENTS:

WHEREAS, the Program is, among other things, an electronic funds transfer ("EFT") and deposit service based in part upon a software package ("Software") developed and owned by RBT, pursuant to which RBT provides for the deposit of EFTs from government or other designated business entities payable to qualified eligible individuals desiring to participate in the Program ("Applicants") and,

WHEREAS, the Program includes systems and methods for providing qualified Applicants (generally un-banked) access to automated teller and "Point of Sale" networks via a machine readable magnetic card, or in the alternative, a check or draft, in lieu of a card and,

WHEREAS, EFI is an independent business entity in the business of providing certain financial services to individuals that desire to participate in the Program, and is an independent contractor of RBT and will serve as agent for Applicants that submit applications to RBT for acceptance into the Program;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Term</u>. This Agreement shall become effective as of the date first written above and shall remain in full force and effect until written notice of termination is sent by either party, unless sooner terminated pursuant to the terms hereof.

2. <u>The Program</u>. Upon receipt by RBT of an application, RBT shall, in its sole discretion, determine whether the Applicant meets the eligibility criteria for the Program. If the Applicant is accepted into the Program ("Client"), RBT shall establish a Currency Connection Deposit Account ("Account") at RBT in order to receive the Client's deposits by EFT. RBT will transmit necessary Account information to EFI. All fees and charges due to EFI will be paid as per the procedures for EFI Fee Payment Schedule, Schedule A, attached hereto. Every pay period RBT will make available to EFI information sufficient to allow EFI to print a check for the Client if the Client is enrolled in the "Check" Program or otherwise make funds, less applicable fees, payable to EFI and RBT available to the Client by use of a debit card. Under the "Check" Program, EFI will act as the Applicant's agent for purposes of generating a check or draft for the Client. Under the "Card" Program, the EFI, for purposes of receiving the disbursement of the Client's funds from the Client's Account, will act as the Client's agent. Clients of the "Card" program will have access to their funds by debit card only after direct deposit is received from originator. The Client shall grant authority to EFI, by written consent, to deliver information contained and transacted in the Client's Account. The Client also grants permission to the EFI to receive and communicate to the Client any and all information contained and transacted in the Client's Account.

3. <u>Representation and Warranties of EFI</u>. To induce RBT to enter into this Agreement, EFI hereby represents and warrants to RBT as follows, which representations and warranties shall continue in effect after this Agreement shall terminate pursuant to the terms hereof.

   3.1 This Agreement has been duly executed and delivered by EFI and constitutes the legal, valid and binding obligation of EFI, enforceable in accordance with its terms.

   3.2 EFI has full right, power and authority to execute, deliver and perform this Agreement and no registration with, or consent or approval of, any governmental agency or authority is required

3.3 The execution, delivery and performance of this Agreement by EFI will not result in any violation of, or be in conflict with, or constitute a default under any agreement, instrument, undertaking, judgment, decree, order, statute, rule or governmental regulation applicable to EFI. EFI is in compliance in all respects with all federal and state laws and all rules, regulations and administrative orders of all state and local commissions, agencies and authorities that are applicable to EFI or to the operation of EFI's business.

3.4 EFI possesses all permits, memberships, contracts, licenses and identification numbers necessary to conduct EFI's business as it is presently being conducted as well as the business conducted under this Agreement.

3.5 EFI acknowledges that RBT may make a proprietary database available for access by EFI and to the extent it does so, it is for the convenience of EFI in order for EFI to fully provide services as defined in this Agreement. EFI further acknowledges that in such event, RBT makes no representation or warranty regarding the accuracy or completeness of any information on the database and RBT shall have no liability by reason of the information thereon being inaccurate or incomplete. EFI shall in no way make available any information on the database to any outside third parties at any time. EFI should reference RBT's Privacy Policy for further information.

4.  Covenants of the EFI.  EFI hereby covenants and agrees with the RBT that EFI will observe and perform all of the following covenants and agreements until this Agreement has been terminated pursuant to the terms hereof.

4.1 EFI agrees to implement and adhere to the policies and procedures regarding the Program established by RBT as set forth herein and/or contained in RBT's Guide. EFI acknowledges that RBT reserves the right, in its sole and absolute judgment and discretion to, from time to time, amend, modify or supplement the Guide and/or to establish additional or alternative policies and procedures relating to the Program. In such event, EFI agrees to be bound by any such amended, modified or supplemented Guide and/or such additional or alternative policies or procedures issued by RBT.

4.2 EFI acknowledges that it is an independent contractor and not an agent of RBT.

4.3 EFI acknowledges that RBT reserves the right to impose additional or alternative Program eligibility requirements as RBT shall determine in its sole and absolute judgment and discretion, and EFI agrees to accept any such additional or alternative eligibility requirements. EFI further acknowledges that its responsibility includes providing information concerning the Program to Applicants and Clients and EFI does not have, and shall not represent that it has, any authority, express or otherwise, to make any changes to the information or applications associated with the Program or to the eligibility criteria applicable to the Program or to make, approve or negotiate any deposit agreement or relationship with any Applicant, Client, or other third party on behalf of RBT. RBT retains the absolute right to determine in its sole and absolute judgment and discretion whether or not to approve any Applicant or continue to maintain any Client under the Program.

4.4 EFI shall insure that each application which it assists the Applicant in preparing and submitting to RBT is fully completed and properly signed and initialed as provided in the Guide and is immediately transmitted to RBT. EFI shall also verify the identity of the Applicant and the information contained in the application in the express manner set forth in the Guide.

4.5 As agent of the Applicants, the EFI shall personally oversee the distribution, completion, collection and transmission to the RBT of completed applications and shall not accept applications from any other individual or entity unless the requirements, for the applications, as contained in the Guide, are met. EFI shall not use any drop off collection points for applications and the use by EFI of any such locations shall be cause for immediate termination

of this Agreement by RBT, in its sole and absolute judgment and discretion, without prior notice to EFI.

4.6 EFI shall be responsible for timely providing the Applicants with the Deposit Institution Designation Form (Application for Direct Deposit), as prescribed in the Guide.

4.7 EFI shall not assist anyone in fraudulently applying for the Program and shall take responsible steps to insure that all information contained on each and every application is accurate and complete, and shall notify RBT immediately if EFI is aware of any information indicating that anyone may have obtained, or may be attempting to obtain, payments by fraud or pursuant to a falsified application. EFI shall use all reasonable and prudent fraud prevention measures, including without limitation, the measures set forth in the Guide. EFI shall be liable to RBT for any losses incurred by RBT resulting from EFI's failure to use all reasonable and prudent fraud prevention measures.

4.8 Upon termination of this Agreement, EFI will promptly return to RBT all data and materials of any kind belonging to RBT, and any trade secrets or other confidential information of RBT, including without limitation, all forms and documents designed or used in connection with the Program.

4.9 EFI acknowledges that it will have custody and control of RBT's checks or drafts if participating in the "Check" Program and that it shall use, keep, complete and disburse such checks or drafts strictly in accordance with the requirements set forth by RBT.

<u>Covenants of RBT.</u>

5.1 RBT will respond to inquiries of EFI and it's authorized employees regarding the Program and the status of applications being processed by RBT. Once an Account is established, RBT will not release any information about the Account to anyone other than the Client, or the Client's designated agent, or the EFI.

5.2 RBT acknowledges that the relationship with EFI governed by this Agreement is not intended to be exclusive and that EFI has the right to participate in similar Programs with other entities.

5.3 When the Client EFT has been received, subject to the availability of verified funds, RBT shall withdraw from the proceeds of each EFT disbursement and disburse to EFI, an amount equal to the fees and charges due EFI from such Program Account provided that the Client has properly authorized withdrawal of such fees and charges and there are no prior superior claims to the funds.

6. <u>Status of the Parties.</u>

6.1 In performing their respective responsibilities pursuant to this Agreement, the relationship between the RBT and EFI is that of independent contractors. This Agreement is not intended to create, nor does it create and shall not be construed to create, a relationship of partner or joint venture or other party hereto as employee or agent of the other. Neither party hereto shall represent that its relationship with the other is anything but that of an independent contractor.

6.2 In performing their responsibilities to each other, EFI and the Applicant or client are in a position of agency pursuant to which the EFI shall be deemed to be an agent for and on behalf of the Applicant or Client.

6.3 Notwithstanding anything contained in this Agreement to the contrary, any third parties used or designated by EFI to perform any of its responsibilities under this Agreement will be deemed to be an agent of EFI and not an agent of RBT. EFI shall be fully liable for the fees charged by or actions or omissions by any such third parties with respect to performance of any EFI functions. The EFI, in performing its obligations to any third party, agrees to maintain as proprietary any and all Confidential Information identified in section 8.4 of this

agreement. The agreements contained in this Section 6.3 and in Section 8.4 shall expressly survive the termination of this Agreement.

7.   Term and Termination.

7.1  This Agreement shall become effective as of the date first written above and shall remain in full force and effect until written notice of termination is sent by either party, upon 30 days prior notice, unless sooner terminated pursuant to the terms hereof. This Agreement, upon termination, shall result in no liability whatsoever of any kind assessed against RBT or EFI unless otherwise expressly provided in this Agreement. RBT may suspend or terminate the Program in its entirety, or partially, or only with respect to EFI, at any time in the event of the occurrence of any one or more of the following:

(i)   Violation by EFI of any provision contained herein or in the Guide;
(ii)  EFI elects to wind up or dissolve its operations or is wound up and dissolved, or becomes insolvent, incurs a material adverse change in its financial condition, makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy for its reorganization or is adjudicated as bankrupt or insolvent;
(iii) Any agency, institution or organization of the federal government institutes any fraud investigation or EFI or its agents, or determines that EFI is involved in fraud with respect to any payments under the Program;
(iv)  Legal, regulatory or operational problems make the Program functionally or economically impractical or infeasible in whole or in part in RBT sole discretion;
(v)   The United States government takes, or fails to take, such action which in the RBT's or Bank's sole and absolute judgment and discretion is inconsistent with the proper and feasible continuation of the Program or, RBT considers such action or omission unacceptable in its sole discretion;
(vi)  RBT elects to place a limit on the size, scope, or geographic reach of the Program.

7.2  Upon termination of this Agreement, all applications shall continue to be the property of RBT, and the rights, covenants, agreements, representations and warranties of the parties pursuant to Sections 3, 4 and 8, along with all provisions relating to the construction of this Agreement, shall survive the termination hereof. All customers with active Accounts with RBT shall remain Clients of RBT at RBT's sole discretion.

8.   Miscellaneous.

8.1  Each party hereto will bear all expenses connected with its performance of the obligations of such party under this Agreement, and neither party will have the right to incur any expense or liability on behalf of any other party.

8.2  EFI will be solely responsible for any liability asserted by any Client for the distribution of EFTs received by RBT. In no event shall RBT be responsible for any EFT proceeds not actually received by RBT and EFI agrees to hold RBT harmless from any such Client claim. RBT will not be liable to EFI or its agents for consequential, incidental, indirect or special damages, or loss of profits or income or the loss of use of other benefits, arising out of or in connection with this Agreement or the services performed hereunder, unless directly and solely attributable to RBT's gross negligence.

8.3  EFI shall indemnify, hold harmless and reimburse RBT's officers, directors, employees and agents, for all expenses and costs, including but not limited to reasonable attorneys' fees, judgments, penalties, payments of other direct expenses and payments and settlement or other disposition of, or in connection with, any claims, disputes, controversies or litigation with respect to anything wrongfully done or not done by EFI or for the violation of any laws, rules or regulations applicable to EFI in connection with the Program.

8.4 In performing its obligations pursuant to this Agreement, EFI may obtain access to and receive certain confidential proprietary information about the Program or RBT, including but not limited to RBT's marketing philosophy and objectives, competitive advantages and disadvantages, the qualifications of applicants, names, addresses and account numbers, technology development, sales volumes, information relating to the software package, or other information of the business affairs of RBT which RBT reasonably considers confidential and/or proprietary (collectively referred to herein as "Confidential Information"). EFI agrees to maintain as proprietary such Confidential Information and further agrees not to use such Confidential Information, nor to disclose such Confidential Information to any third party. The agreements contained in this Section 8.4 shall expressly survive the termination of this Agreement.

8.5 This Agreement may not be assigned by EFI or RBT without the prior written consent of the other.

8.6 Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be in effect to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Any headings or captions preceding the text of the several sections hereof are intended solely for convenience or reference and shall not constitute part of this Agreement nor shall it effect its meaning, construction or effect.

8.7 This Agreement will be governed by federal law and the laws of the Commonwealth of Kentucky, shall be binding upon both parties and their respective successors and assigns, and shall inure to the benefit of both parties and their respective successors and assigns. All actions to enforce or construe this Agreement shall be commenced by either RBT, or EFI in a court of competent jurisdiction in the Commonwealth of Kentucky and nowhere else.

8.8 All notices and other communications required or permitted to be given hereunder shall be in writing and shall be sent either (I) by depositing it is the United States mail addressed to such party at its address set forth below, with postage thereon prepaid, and any notice or demand so mailed will be deemed to have been given at the time when it was mailed, or (ii) by courier, telecopier or similar method to such party at its address as set forth below, and any such notice or demand so transmitted will be deemed to have been given at the time it was transmitted. Any such notice or demand shall be addressed as follows:

> If to EFI:
>
> Name: _____
>
> Attn: _____
>
> Address: _____
>
> _____
>
> If to RBT:
>
> Address:        Republic Bank & Trust Comapny
>                 Attn: Mike Keene
>                 601 West Market Street
>                 Louisville KY 40202
>                 Phone: (502) 583-2056
>                 Fax: (502) 588-1045

Such notices may be sent to such other addresses either party may furnish to the other in writing pursuant to notices provided in this paragraph.

8.9 This Agreement contains the entire understanding of the parties hereto with respect to the subject matter of this Agreement. There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth herein.

**RBT MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OTHERWISE WITH RESPECT TO THE SOFTWARE PACKAGE. RBT'S LIABILITY IN CONNECTION WITH THE SOFTWARE PACKAGE SHALL IN NO EVENT EXCEED THE AMOUNT PAID BY EFI FOR THE LICENSE TO THE SOFTWARE PACKAGE AND RBT SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES, LOST PROFITS, SPECIAL DAMAGES OR ANY OTHER DAMAGES OR EXPENSES.**

This Agreement supersedes any prior agreements and understandings between the parties hereto with respect to such subject matter. Except as otherwise provided in this Agreement, this Agreement may be amended only by a written instrument duly executed by the parties.

8.10 Except as otherwise provided in this Agreement, the remedies provided herein will be cumulative and will not preclude the assertion by any party of any other rights or any other remedies against any other party. No party will be deemed to have waived any of its rights, powers or remedies under this Agreement unless such waiver is approved in writing by the waiving party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement through their duly authorized representatives on the date first above written.

REPUBLIC BANK & TRUST COMPANY

By: _____

Title: _____

("RBT")

Name: _SAFE DEPOSITS, INC._

By: _Steven Cusumano_

Title: _PRESIDENT_

("EFI")

STEVEN CUSUMANO
11/17/03

**Schedule A**

Currency Connection EFI Debit Card Fee Split

| Customer Fees: | | EFI Fee Split: | |
|---|---|---|---|
| Account Set-up: | $10.00 | Account Set-up: | $ 2.00 |
| Monthly Charge: | $ 10.00 | Monthly Charge | $ 4.00 |
| ATM Charge: | $ 2.00 | ATM Charge: | $ .75 |
| POS Charge: | $ 1.00 | POS Charge: | $ .25 |
| Bal Inquiry: | $ 1.00 | Bal Inquiry: | $ .15 |
| OD $hield: | 25% of amount | OD $hield: | 25% of OD charge |

SEE ATTACHED:

| | SET-UP | MONTHLY | ATM- DOM | ATM-INTL | POS-DOM | POS-INTL | BI-DOM | BI-INT |
|---|---|---|---|---|---|---|---|---|
| Fee to cardholder | $10.00 | $10.00 | $2.00 | $4.00 | $1.00 | $2.00 | $1.00 | $3.0 |
| EFI earns | $2.00 | $4.00 | $0.75 | $1.00 | $0.25 | $0.75 | $0.15 | $0.25 |

In addition to the above fees, the EFI will also earn 15% of the collected bank fee (25%) for each overdraft.