UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
Charles M. Hallinan,                                  :
                                                      :          06 Civ. 185 (HB)
            Plaintiff,                                :
                                                      :
    -against-                                         :          **OPINION & ORDER**
                                                      :
Republic Bank & Trust Company,                        :
                                                      :
            Defendant.                                :
------------------------------------------------------X

**Hon. Harold Baer, Jr., District Judge:**

Plaintiff Charles M. Hallinan ("Hallinan") brought this action for, *inter alia*, breach of contract, fraud, negligent misrepresentation and tortious interference with contractual relations against defendant Republic Bank & Trust Co. ("Republic"). Republic now moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the foregoing reasons, Republic's motion to dismiss is granted in part.

## BACKGROUND

Hallinan alleges that Republic fraudulently induced him to invest approximately $350,000 in Benefits Express, L.L.C. ("Benefits Express" or "Benefits") and that Republic's actions resulted in the loss of Hallinan's investment. Benefits Express provided banking services to "underserved" individuals who lacked conventional checking accounts. (Comp. ¶ 5). Benefits Express began operations in 1995, and created a program known as Direct Deposit Plus ("DDP") which provided direct deposit services to customers for use with government benefits checks so that the funds would become immediately available to the payees. (Id. ¶¶ 5, 7-8).

In 1998, Benefits Express contracted with Republic to participate in the DDP program. (Id. ¶ 13). In 2000, Benefits Express initiated a debit card program with an optional overdraft feature. (Id. ¶¶ 14-15). This product allowed customers to withdraw funds at ATM machines, including up to $200 more than the balance in each customer's account. (Id.) If the customer overdrew his or her account, that customer would incur overdraft fees. (Id. ¶ 15). Hallinan alleges that, prior to November 2001, Benefits

1

Express and Republic had no agreement in place regarding the operation of the overdraft program or the division of overdraft fees. (Id. ¶ 16). However, in practice Republic paid Benefits 42% of overdraft fees collected minus a corresponding share of projected writeoffs for accounts that Republic identified as likely to become delinquent. (Id. ¶¶ 17-19).

In 2001, Benefits realized a shortfall of approximately $160,000 in its overdraft account with Republic. (Id. ¶ 20). Benefits' principals approached the plaintiff to cover the shortfall by investing in their business. (Id. ¶¶ 22-23). Hallinan then attended several meetings with representatives of Benefits and Republic to discuss the operation of the overdraft program. (Id. ¶ 24). As a result of these discussions, Republic agreed to provide Benefits with 90% of future overdraft fees collected and to pass the fees on to Benefits in a "timely manner." (Id. ¶¶ 28-29). The parties memorialized their agreement in a writing (hereinafter referred to as the "Overdraft Contract"), which was executed on or about November 15, 2001. (Id. ¶ 32, Ex. A).

The Overdraft Contract provided, in addition, that Hallinan would pay Republic $159,577.31 on behalf of Benefits Express to cover the current shortfall in Benefits' overdraft account. (Id. ¶ 34, Ex. A). The agreement also provided for Hallinan to provide Benefits with "adequate capital as needed in Hallinan's judgment to ensure [Benefits'] continued operation and growth." (Id. ¶ 35, Ex. A). Republic would retain 20% of the fees due to Benefits to cover losses from delinquent accounts. (Id., Ex. A).

Also on November 15, 2001, Hallinan entered into a separate agreement (hereinafter referred to as the "Capitalization Contract") with Benefits' principals, Barry Kessler ("Kessler") and Steven Cusamano ("Cusamano"). (Id. ¶ 41, Ex. B). That agreement provided for Hallinan to receive a 60% interest in Benefits Express[1] in consideration for Hallinan's satisfaction of "certain outstanding obligations" to Republic as well as for "future unspecified capital contributions" to be provided by Hallinan "as . . . needed." (Id., Ex. B). The Capitalization Contract also stated that amounts paid by Hallinan to Republic in satisfaction of outstanding obligations "shall be treated as a loan"

---

[1] The Capitalization Contract also stated that Hallinan would receive a 60% interest in another entity, Electronic Payment Systems, Inc. (Comp., Ex. B).

2

from Hallinan to Benefits Express. (Id., Ex. B). Ultimately, Hallinan invested approximately $350,000 in Benefits Express. (Id. ¶ 40).

Hallinan alleges that Republic refused to pay Benefits 90% of the overdraft fees collected, as had been agreed, but rather continued to pay Benefits 42%. (Id. ¶ 47). Hallinan further alleges that Republic did not pass along Benefits' share of the fees in a timely manner, and that Republic "continued to withhold excessive projected chargeoffs . . ." (Id. ¶ 48) Hallinan also asserts that, in 2003, after Benefits experienced another cash shortfall, Republic attempted to "strong-arm" Kessler into selling Benefits to Republic for a below-market price. (Id. ¶¶ 54-57). Hallinan alleges that Republic ultimately appropriated Benefits' customer list and recruited Cusamano to assist it in providing services that directly competed with those provided by Benefits Express. (Id. ¶¶ 50-51, 58-62).

On July 10, 2003, Benefits Express filed an action against Republic in this District alleging claims for, *inter alia*, breach of contract and unjust enrichment. (Declaration of Andrew J. Defalco, dated February 17, 2006, Ex. D). That action was dismissed in favor of arbitration. The arbitration between Benefits and Republic was pending when Hallinan filed this action. On March 24, 2006, after Republic's motion to dismiss this suit was briefed (but before the parties appeared for oral argument) the arbitrator issued an award in favor of Benefits Express in the amount of $374,314 (excluding interest).

## DISCUSSION

Republic argues that: 1) Hallinan's claims are *res judicata* as a result of the prior arbitration between Benefits and Republic; and 2) Republic could not have tortiously interfered with the Capitalization Contract because the Capitalization and Overdraft Contracts constituted a single agreement.

### A. The *Res Judicata* Argument

*Res judicata* "will preclude relitigation of a claim where the earlier decision was a final judgment on the merits rendered by a court of competent jurisdiction, in a case involving the same parties or their privies . . ." Amalgamated Sugar Co. v. NL Industries,

3

Inc., 825 F.2d 634, 639 (2d Cir. 1987). This doctrine applies with equal force to determinations made in arbitral proceedings. See Pike v. Freeman, 266 F.3d 78, 90 (2d Cir. 2001). "The burden is on the party seeking to invoke *res judicata* to prove that the doctrine" is applicable. Computer Assocs. Int'l. Inc. v. Altai, Inc., 126 F.3d 365, 369 (2d Cir. 1997). A motion to dismiss on the basis of *res judicata* should only be granted "when it is clear, from the complaint and from matters of which the court takes judicial notice, that plaintiff's claims are barred as a matter of law." Houbigant, Inc. v. Development Specialists, Inc., 229 F. Supp. 2d 208, 220 (S.D.N.Y. 2002).

*Res judicata* encompasses two concepts: issue preclusion and claim preclusion. See Murphy v. Gallagher, 761 F.2d 878, 879 (2d Cir. 1985). Issue preclusion is sometimes referred to as "collateral estoppel," while claim preclusion is sometimes referred to simply as "*res judicata*." Id. Unlike issue preclusion, claim preclusion applies to "claims asserted in [a] subsequent action [that] were, *or could have been*, raised in [a] prior action." Pike, 266 F.3d at 91 (emphasis added) (internal quotation omitted). Both doctrines require privity between the party to the prior proceeding and the party against whom preclusion is invoked. See Stichting v. Schreiber, 327 F.3d 173, 185 (2d Cir. 2003).

"The doctrines of collateral estoppel in general, and of privity in particular, are shaped by fundamental notions of due process." Id. at 184. In general, a prior adjudication has preclusive effect on a nonparty to that adjudication "only if that nonparty was represented by a party to the prior proceeding, or exercised some degree of actual control over the presentation on behalf of a party to that proceeding." Id. at 184-85. Thus, privity exists either where: 1) "a party to a previous suit was, at the time of the litigation, acting as either a fiduciary or organizational agent of the person against whom preclusion is asserted[;]" or 2) the nonparty "exercised some degree of actual control" over the conduct of the prior proceeding. Id. at 185.

"[T]he question whether parties are in privity is a factual determination of substance, not mere form." Id. at 186 (internal quotation omitted). See also Alpert's Newspaper Delivery, Inc. v. The New York Times, 876 F.2d 266, 270 (2d Cir. 1989) (privity analysis is "one of substance rather than [of] the names in the caption of the case"). For instance, "there is no bright line rule as to whether or not shareholders are in

4

privity with their corporation for *res judicata* purposes. Rather, a finding of privity between a shareholder and [a] corporation depends on whether, under the circumstances, the interests of the nonparty were adequately represented." Amalgamated, 825 F.2d at 640. Thus, with regard to the relationship between a corporation and its shareholder, "[t]he question whether" the corporation's interests are "virtually representative" of the interest of a shareholder "is one of fact for the trial court." Id. at 641 (internal quotation omitted).

Here, Republic argues that *res judicata*, or claim preclusion, bars this action in its entirety. Republic asserts that Hallinan received a controlling interest in Benefits Express by virtue of the Capitalization Contract. Thus, Republic argues that Benefits acted as Hallinan's agent during the course of the arbitration. Further, Republic argues that Hallinan actually controlled the arbitration on behalf of Benefits.

In support of its position, Republic has provided excerpts from the arbitration transcript that indicate that Hallinan "assisted in the funding" of the arbitration on behalf of Benefits. (See Declaration of Glenn A. Cohen, dated February 2, 2006 ("Cohen Dec."), Ex. B).[2] Hallinan, who testified before the arbitrator, stated at the arbitration that he supported Benefits' cause because he thought that Benefits "was wronged . . . [and] I don't think I was treated very well either." (Id.) Hallinan testified that, pursuant to the Capitalization Contract, he had the right to receive a 60% interest in Benefits, and in addition Benefits would owe him any funds he contributed as capital contributions. (Cohen Dec., Ex. D). Hallinan stated that, if Benefits was successful in the arbitration, he "would hope to get [his] $350,000 back." (Id.)[3] Republic also asserts that Hallinan "vetoed" a potential settlement of Benefits' claims against Republic, thereby forcing Benefits to go to arbitration. (Affidavit of Glenn Cohen, dated March 3, 2006 ("Cohen Aff.") ¶¶ 6-7).

On the other hand, Hallinan cites portions of the arbitration transcript that indicate that Hallinan waived, or at least never exercised, his "option" to acquire 60% of Benefits Express. (Declaration of Andrew J. DeFalco, dated February 17, 2006 ("DeFalco Dec."),

---

[2] Both parties have provided supporting factual affidavits and excerpts from the transcript of the prior arbitration proceeding. Neither party has objected to my considering these materials in connection with this motion to dismiss.

[3] However, Hallinan also testified that he didn't know if he had a "stake" in the Benefits arbitration because, according to Hallinan, "[t]here may not be anything in it for me." (Cohen Dec., Ex. D).

5

Ex. F at 80-81, 158). More importantly, Hallinan has provided an affidavit from Benefits' arbitration counsel, David Feureisen, stating that Kessler (not Hallinan) retained Feureisen to represent Benefits and paid Feureisen his initial retainer. (Affidavit of David Feureisen, dated February 16, 2006 ("Feureisen Aff.") ¶ 3). Feureisen also attests that: 1) he had no contact with Hallinan prior to filing Benefits' complaint against Republic; 2) that Benefits' complaint was not intended to protect Hallinan's interests or to incorporate any of Hallinan's claims; and 3) that Feureisen's only contact with Hallinan during the course of his representation of Benefits was to prepare Hallinan for his testimony before the arbitrator. (Feureisen Aff. ¶¶ 5-10, 15). Furthermore, Feureisen contests Republic's assertion that Hallinan vetoed the potential settlement of Benefits' claims against Republic. Rather, Feureisen attests that Republic's counsel, unbeknownst to Feureisen, met with Hallinan independently prior to the mediation. (Supplemental Affidavit of David Feureisen, dated April 7, 2006 ("Supp. Feureisen Aff.") ¶ 4). Feureisen asserts that Republic's counsel represented at the mediation that he had secured a commitment from Hallinan to abandon any claim to the proceeds of Benefits' settlement with Republic. (Id. ¶ 7). When this representation proved inaccurate, the settlement was abandoned. (Id. ¶¶ 12-13). According to Feureisen, Hallinan was merely "one of several creditors of Benefits Express." (Id. ¶ 5).

On this record, I cannot conclude as a matter of law that Hallinan controlled Benefits' litigation against Republic. The fact that Hallinan defrayed some portion of Benefits' expenses is not sufficient to create privity between Hallinan and Benefits.

Furthermore, Hallinan was not a party to the original 1998 agreement between Benefits and Republic that contained the arbitration clause. (DeFalco Dec., Ex. E). Thus, Hallinan never consented to arbitration. See Usina Costa Pinto, S.A. v. Louis Dreyfus Sugar Co., Inc., 933 F. Supp. 1170, 1176 (S.D.N.Y. 1996) (finding lack of privity between two corporations where one was not a signatory to an arbitration agreement and therefore could not have been compelled to arbitrate claims). Republic, relying on New York authority, argues that shareholders who use a corporation as their alter ego "should not be able to relitigate issues previously adjudicated" in arbitration. Shire Realty Corp. v. Schorr, 55 A.D.2d 356, 365-66 (N.Y. App. Div. 2nd Dep't 1977).

6

However, unfortunately for Republic, it has not shown that Benefits acted as Hallinan's alter ego.

In sum, Republic has not shown that Hallinan was in privity with Benefits for the purpose of claim preclusion. However, because the arbitrator's award had not yet issued when this motion was filed, neither party focused on the *issue* preclusive effects of that award. Therefore, after additional discovery has been taken, Republic may be able to demonstrate that Benefits adequately represented Hallinan's interest with respect to certain issues adjudicated in the arbitration. Likewise, Hallinan may be able to successfully assert collateral estoppel against Republic with regard to issues determined in Benefits' favor.

### B. Tortious Interference

"Under New York law, a tortious interference claim requires a showing that a valid contract exists and that a third party with knowledge of the contract intentionally and improperly procured its breach." TVT Records v. The Island Def Jam Music Group, 412 F.3d 82, 88 (2d Cir. 2005).[4] However, "[a]n important qualification exists: One asserting a tortious interference claim must also show that the defendant was not a party to the contact with which [it] allegedly interfered." Id. "'Whether multiple writings should be construed as one agreement depends on the intent of the parties'. . ." Id. at 89 (quoting Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 52-53 (2d Cir. 1993)). "But if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." Id. at 89. To determine if multiple contracts constitute a single agreement for purposes of tortious interference, "'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they . . . were not all between the same parties.'" Id. (quoting This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)).

Republic argues that it cannot be liable for tortiously interfering with the Capitalization Contract (to which it was not a party) because the Overdraft Contract (to

---

[4] While Republic relies in part on Georgia law in support of its argument that Hallinan's claim for tortious interference is deficient, this dispute has no apparent relation to the State of Georgia. Indeed, in its reply brief Republic apparently concedes this point, and relies solely on New York authority.

which it was a party) was part of the same overarching agreement between Hallinan, Benefits and Republic. Indeed, the two agreements were intended to effectuate the same purpose, i.e., to enlist Hallinan to extinguish Benefits' debt to Republic and to set forth Hallinan, Benefits and Republic's resulting obligations vis a vis each other. To the extent that Republic tortiously interfered with the Capitalization Contract, it did so by failing to honor its obligations under the Overdraft Contract. See TVT Records, 412 F.3d at 89 (finding two contracts constituted single agreement since one was meaningless without the other and any tortious interference by defendant also constituted breach of defendant's contract with plaintiff). Therefore, Republic was not a "stranger" to the Capitalization Contract and Hallinan's claim for tortious interference fails as a matter of law.

## CONCLUSION

For the reasons set forth above, Republic's motion to dismiss is GRANTED with respect to Hallinan's claim for tortious interference and DENIED in all other respects. The Clerk of the Court is directed to close this motion and remove it from my docket.

**SO ORDERED.**

**June \_\_, 2006**
**New York, New York**

U.S.D.J.

8