**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**CHARLES M. HALLINAN,**                                :
                                                         :
                                            **Plaintiff,**    :
                                                         :      **06 Civ. 185 (HB)**
                **- against -**                           :
                                                         :      <u>OPINION</u>
                                                         :      <u>AND</u> <u>ORDER</u>
**REPUBLIC BANK & TRUST COMPANY,**       :
                                                         :
                                          **Defendant.**     :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Charles Hallinan ("Plaintiff" or "Hallinan") has brought this action against Republic Bank & Trust Company ("Defendant" or "Republic"), his remaining claims being breach of contract, fraud, constructive fraud, and negligent misrepresentation arising out of a November 2001 contract between Hallinan, Republic, and the corporation Benefits Express, LLC ("Benefits").

Republic now moves for summary judgment against Hallinan primarily on the grounds that *res judicata* and collateral estoppel bar Hallinan's claims, as Benefits litigated similar claims in its prior arbitration against Republic. Republic also moves to dismiss Hallinan's fraud, constructive fraud, and negligent misrepresentation claims for Hallinan's failure to state a claim as a matter of law.

Because Republic has not met its burden to prove that *res judicata* or collateral estoppel bars Hallinan's instant claims, I must deny Republic's motion for summary judgment which sought to dismiss all of Hallinan's instant claims on those grounds. However, because Hallinan's fraud, constructive fraud, and negligent misrepresentation claims fail as a matter of law, Republic's motion is granted as to those claims.[1]

## I.    BACKGROUND

The following facts are undisputed, except where otherwise noted.

a.    <u>Relationship between Benefits, Republic, and Hallinan</u>

Hallinan's complaint, at heart, alleges that Republic fraudulently induced him to

---

[1] The Court wishes to thank Lucas Charleston of New York Law School for his assistance preparing this Opinion.

invest approximately $350,000 in Benefits Express, L.L.C. and that Republic's actions resulted in the loss of his investment. <u>See</u> Plaintiff's Complaint, January 11, 2006 ("Pl. Complaint").

Benefits Express provided services to "underserved" individuals who lacked conventional checking accounts. Defendant's Statement of Undisputed Material Facts, ¶ 2 ("Def. Facts"). In 1998, Benefits Express contracted with Republic to participate in Benefits' Direct Deposit Plus program, which provided direct deposit services to Benefits' customers receiving government benefits checks. Def. Facts ¶ 1. Benefits and Republic split certain fees that the program earned on services provided. Plaintiff's Response to Defendant's Rule 56.1 Statement, ¶ 3 ("Pl. Facts"). Prior to November 2001, Republic paid Benefits 42% of the overdraft fees Republic collected minus a corresponding share of projected writeoffs for accounts that Republic identified as likely to become delinquent. Def. Facts ¶ 3. However, this division of overdraft fees was not formally stated in the 1998 agreement. Pl. Facts ¶ 3, <u>citing</u> Declaration of Glenn Cohen, October 16, 2006, Ex. A ("Cohen Decl.").

In 2001, Benefits realized a shortfall of approximately $160,000 in its overdraft account with Republic. Def. Facts ¶ 6. Benefits' President, Barry Kessler ("Kessler"), approached Hallinan to cover the shortfall by investing in Benefits' business. Def. Facts ¶ 9, Pl. Facts ¶ 9. Hallinan discussed his potential investment with Benefits and Republic principals, as well as the future operation of the overdraft program. Def. Facts ¶ 10, Pl. Facts ¶ 10.

Hallinan agreed to loan Benefits nearly $160,000, which was paid directly to Republic. Def. Facts ¶ 11, 14; Pl. Facts ¶ 11, 14; Cohen Decl. Ex. C. The parties memorialized their agreement in a signed contract dated November 15, 2001 (the "Overdraft Contract").[2] Cohen Decl. Ex. C. In the contract, Hallinan also agreed to

---

[2] Republic alleges that Hallinan viewed the 2001 Overdraft Contract as a mere "letter of intent," and the parties would later agree on final terms. <u>See</u> Def. Facts ¶ 15, <u>citing</u> Deposition of Charles M. Hallinan, June 6, 2005, <u>at</u> Cohen Decl. Ex. W ("[T]his is in effect a letter of intent… I don't think it was meant to be the definitive agreement…. "[I]t was contemplated that there would be another agreement at some point in time.") Hallinan avers that he, and the parties, viewed the 2001 Overdraft Contract as fully enforceable. Pl. Facts ¶ 15, <u>citing</u>, <u>e.g.</u>, Deposition of Charles M. Hallinan, June 6, 2005, Cohen Decl. Ex. W ("The parties are agreeing to these principal terms…"); Deposition of Michael Keene, Sept. 14, 2006, <u>at</u> Declaration of Andrew Stutzman, November 10, 2006 ("Stutzman Decl."), Ex. A-4 ("[E]veryone agreed to their terms and then Barry drew up a document." Q: "And then the document was designed to memorialize the terms that had been agreed upon?" A: "Yes.").

provide Benefits with "adequate capital as needed in Hallinan's judgment to ensure [Benefits'] continued operation and growth."  Cohen Decl. Ex. C.   In return, Republic agreed to provide Benefits with 90% of gross overdraft fees collected.  Cohen Decl. Ex. C.  Benefits also agreed to establish a reserve account at Republic Bank to protect Republic from additional risk.  Cohen Decl. Ex. C; Def. Facts ¶ 14, Pl. Facts ¶ 14.[3] Republic agreed to set aside in that reserve account 20% of the overdraft fees due to Benefits to cover losses from delinquent accounts.

The Overdraft Contract, on its face, refers to Hallinan as a "shareholder."[4]  Cohen Decl. Ex. C.  Republic thus alleges that "Hallinan signed the November 2001 Agreement as a shareholder of Benefits Express." Def. Facts ¶ 15.  Hallinan avers that he was "never a shareholder of Benefits and never acted as such."  Pl. Facts ¶ 15, citing, e.g., Deposition of Charles Hallinan, August 8, 2006, p. 89-90, at Stutzman Decl., Ex. A-1 ("…I was… not a shareholder and never was a shareholder.").

Concurrently, however, on November 15, 2001, Hallinan entered into a separate agreement (the "Capitalization Contract") with Benefits' principals, Kessler and Steven Cusamano ("Cusamano").  Cohen Decl., Ex. B.  In that written agreement, the parties agreed that "Hallinan shall receive a sixty (60%) percent interest in [Benefits] in consideration for the satisfaction by Hallinan of certain outstanding obligations of [Benefits] to [Republic] and future unspecified capital contributions to be provided by Hallinan to [Benefits] as may be needed."  Cohen Decl., Ex. B.  Hallinan characterizes that agreement as providing him with an "option" to acquire a 60% interest in Benefits in return for his loan.  Hallinan further avers that he never exercised that option.  Pl. Facts ¶ 16, citing Deposition of Charles M. Hallinan, August 8, 2006, at Stutzman Decl., Ex. A-1, p. 90 ("I had the option… to become a 60 percent shareholder if I exercised that option, but I never did.")  Hallinan alternatively and concurrently characterizes himself as

---

[3] Hallinan alleges that the 90%/10% "fee split" was to begin immediately.  Pl. Facts ¶ 14.  Republic avers that its understanding was that the 90%/10% "fee split" would begin only when the reserve funds reached a level of $200,000.  Def. Facts ¶ 14.

[4] The contract begins, "The following outlines the terms of the Agreement entered into this fifteenth day of November, 2001 between Republic Bank & Trust Company (the BANK), Benefits Express, LLC (the COMPANY), and Charles M. Hallinan (HALLINAN), Barry J. Kessler (KESSLER) and Steven R. Cusamano (CUSAMANO) (collectively, the shareholders of the COMPANY)."  Cohen Decl. Ex. C.

a "creditor" of Benefits.[5]  The Capitalization Contract states on its face that the amounts paid by Hallinan to Benefits in satisfaction of Benefits' obligations "shall be treated as a loan."  Cohen Decl., Ex. B.

Ultimately, Hallinan, by his own account, invested approximately $350,000 in Benefits Express.  Pl. Complaint, ¶ 40.

In early 2003, Benefits and Republic began discussing Republic's acquisition of Benefits' business.  Def. Facts ¶ 24-25, Pl. Facts ¶ 24-25.[6]  Republic's principals communicated an offer of $200,000 to Benefits' principals (i.e. Kessler and Cusamano), as well as Hallinan.  Def. Facts ¶ 26, Pl. Facts ¶ 26.[7]  As later found by an arbitrator, the parties reached agreement that Republic would purchase Benefits' assets for two hundred thousand dollars, subject to offset by any overdrafts, fees or expenses.  Def. Facts ¶ 26; see also Award of Arbitrator, March 24, 2006, at Cohen Decl. Ex. K.  As later found by the arbitrator, the parties memorialized the terms of their agreement in a draft asset purchase agreement dated May 9, 2003 (the "2003 Agreement"), although that agreement was never signed.  Def. Facts ¶ 26-30; Award of Arbitrator, March 24, 2006, at Cohen Decl. Ex. K.

b.  Benefits Commences Against Republic

On July 10, 2003, instead of completing the sale, Benefits Express brought suit against Republic in the Southern District of New York.  Def. Facts ¶ 33, citing Cohen Decl. Ex. E (Benefits' complaint); see also Benefits Express v. Republic Bank, No. 03-cv-5138 (S.D.N.Y. 2003) (SAS).  The parties subsequently stipulated to arbitration.  Def. Facts ¶ 34.  Benefits brought three claims in arbitration.  First, Benefits alleged that Republic breached the 2001 Overdraft Contract by not immediately paying Benefits 90% of overdraft fees, and instead taking the position that the "90/10 split" only started upon Benefits' establishment of the reserve account.  Demand of Arbitration, December 7,

---

[5] See, e.g., Deposition of Charles M. Hallinan, June 6, 2005, at Cohen Decl. Ex. W, p. 116 (A: "…I'm also a creditor." Q: "It's the best of all worlds?" A: "Absolutely.")

[6] Republic alleges, based on the testimony of its principals, that Hallinan proposed the idea of Benefits selling its business to Republic.  Def. Facts ¶ 24.  Hallinan denies that he proposed the idea.  Pl. Facts ¶ 24.

[7] Republic's principals testified that Hallinan advised Benefits that $200,000 was "more than you have now."  Def. Facts ¶ 26.  Hallinan denies this without directly refuting their testimony.  Pl. Facts ¶ 26, citing Deposition of Charles M. Hallinan, June 6, 2005, at Stutzman Decl. Ex. A-2, p. 150 ("I didn't add very much [to the conversation, I just listened.").

2004, <u>at</u> Cohen Decl., Ex. F.[8]  Secondly, Benefits claimed that Republic breached their

2003 Agreement by failing to negotiate in good faith and pay fair value for the purchase

of Benefits' business.  <u>Id.</u>[9]  Lastly, Benefits claimed that Republic breached the 1998

Agreement between Benefits and Republic by "unfairly causing the takeover of

[Benefits'] business."  <u>Id.</u>[10]

On June 14, 2004, Hallinan Capital Corp. made out a check to Feureisen's law

firm for $14,494, with the memo line "Benefits Express / 64300M," apparently signed

personally by Hallinan.  Cohen Decl., Ex. Y.

In September 2004, Benefits and Republic attempted to mediate their claims.

Def. Facts ¶ 43; Pl. Facts ¶ 43, <u>citing</u> Supplemental Affidavit of David Feureisen, April 7,

2006, <u>at</u> Stutzman Decl. Ex. E, ¶ 4 <u>et. seq.</u>  The parties reached a settlement agreement

providing for Republic to pay Benefits $250,000, which was memorialized in writing and

signed by principals and counsel for Benefits and Republic.  Def. Facts ¶ 43; <u>see also</u>

Settlement Memorandum Agreement, <u>at</u> Cohen Decl.  Ex. M.  The agreement expressly

stipulated that it was subject to Hallinan waiving any claim to the settlement funds and

any claims against Benefits or Kessler generally.  Settlement Memorandum Agreement,

<u>at</u> Cohen Decl. Ex. M, ¶ 1.[11]  Hallinan refused to waive his claims, and the settlement was

---

[8] Benefits' Claim No. 1 in its Demand for Arbitration states in relevant part: "Claimant alleges that Respondent breached an agreement dated November 15, 2001 to pay a specified percentage of fees on certain transactions generated by Claimant customers. Respondent's position is that the revised fee structure would apply only after Claimant made up a prior deficiency, which deficiency remains uncured." The Claim then refers back to Benefits' complaint in the No. 03-cv-5138 Southern District litigation.  That Complaint adds greater detail to Benefits' claim, <u>e.g.</u>, "[Republic] breached the 2001 agreement by persistently remitting a lower percentage of overdraft fees than the 90% required under the 2001 Agreement."  Plaintiff's Complaint, July 10, 2003, No. 03-cv-5138, ¶ 12.  Benefits claimed damages of $315,000 owing to this breach.

[9] Benefits Claim No. 2 states in part: "Claimant alleges that Respondent breached an oral agreement to purchase Claimant's business and assets and failed to negotiate in good faith in arriving at an appropriate purchase price for the business and failed to minimize losses incurred by Claimant as a result of the takeover."  The Claim goes on to state Republic's position, and refers back to Benefits' complaint in the No. 03-cv-5138 Southern District litigation.  That complaint adds greater detail to Benefits' claim and claims damages for the "fair value of the business of Benefits."  Plaintiff's Complaint, July 10, 2003, No. 03-cv-5138, ¶ 17-22.

[10] Benefits Claim No. 3 states in full: "Claimant alleges that Respondent breached the terms of a written agreement dated November 23, 1998 by unfailrly causing the takeover of the business and by failing to pay all sums due Claimant under the agreement and failing to compensate Claimant for the good will associated with the business."

[11] Paragraph 1 of the Settlement Agreement begins, "Subject to a written Waiver and Release executed by Charles Hallinan of any claim to any portion of the settlement funds contemplated herein and a waiver of

not completed.  Def. Facts ¶ 44, Pl. Facts ¶ 44.

On December 30, 2004, Hallinan Capital Corp. wrote a check to Feureisen's law firm for $7,118.57, with the memo line "Client 64300M," apparently signed personally by Hallinan.  Cohen Decl., Ex. Y.

### c. Prior Arbitration by Benefits Against Republic

Benefits' claim against Republic proceeded to arbitration on November 10 through November 17, 2005.  Def. Facts ¶ 45.  Hallinan's involvement in the arbitration as a testifying witness is undisputed.  Def. Facts ¶ 45.  The extent and nature of Hallinan's additional involvement in the arbitration proceedings is, however, disputed.

Prior to the arbitration, Hallinan met with Benefits representatives, who subsequently kept him abreast of certain developments in the litigation.  In July 2005, Kessler and Benefits' counsel, David Feureisen ("Feureisen"), met with Hallinan in Philadelphia to discuss Benefits' case against Republic.[12]  Def. Facts ¶ 37.  Hallinan avers that the purpose of this meeting was to prepare Hallinan in his role as a witness for his testimony.  Pl. Facts ¶ 37.[13]  Feureisen wrote Hallinan after the meeting, on July 15, 2005, stating, "I have enclosed your files and a copy of our mediation memo."[14]  Letter of David Feureisen, July 15, 2005, at Cohen Decl., Ex. N.   The "mediation memo" was Benefits' confidential statement that it submitted at the 2004 mediation, setting forth a statement of facts, relevant law, an analysis of Benefits' positions, and potential obstacles

---

any claims against Benefits Express (and/or its parent corporation) and Barry Kessler personally…" Settlement Memorandum Agreement, at Cohen Decl. Ex. M, ¶ 1

[12] The meeting appears to have been on July 13, 2005.  See Letter of David Feureisen, July 15, 2005, at Cohen Decl., Ex. N (writing Hallinan, and stating that "it was a pleasure meeting with you on Wednesday," the Wednesday prior to the letter being July 13).

[13] See also Affidavit of David Feureisen, February 16, 2006, at Stutzman Decl. Ex. B, ¶ 15 ("The purpose of this meeting was to ascertain facts from a potential witness, not to discuss strategy.").

Generally, Feureisen and Hallinan both flatly deny, broadly and specifically, that Hallinan participated in strategic decisions made during the Benefits litigation.  See Declaration of Charles Hallinan, November 8, 2006, at Stutzman Decl., Ex. C, ¶ 5 ("I made no decisions with respect to strategy in the Benefits Express litigation and exercised no control over that litigation."); Declaration of David Feureisen, November 7, 2006, at Stutzman Decl., Ex. D, ¶ 6 ("Charles Hallinan took part in no strategy sessions or otherwise decided strategy in the Benefits Express case.")  Hallinan goes on to state that he had no input into drafting the complaint or its claims; never spoke to Feureisen regarding selection of witnesses; and never was consulted on selecting exhibits, the arbitrator, or the mediator.  See Declaration of Charles Hallinan, November 8, 2006, at Stutzman Decl., Ex. C, ¶¶ 8, 10-12.

[14] Republic avers that Feureisen's enclosures were for Hallinan's "review and comment."  Def. Facts ¶ 38. Hallinan correctly points out that Feureisen's letter does not state the words "review and comment."  Pl. Facts ¶ 38.

to settlement.  Benefits Express, LLC's Mediation Statement, at Cohen Decl., Ex. N.
Regarding Feureisen's reference to "enclos[ing] files," Hallinan avers that Feureisen
returned Hallinan's files to Hallinan, which Hallinan had loaned to Feureisen for the
meeting.  Pl. Facts ¶ 38.[15]

On August 8, 2005, Feureisen faxed Hallinan a copy of Feureisen's August 5,
2005 letter to the arbitrator that a) requested permission to amend Benefits' complaint
against Republic to add an additional claim and seek additional damages; b) requested an
extension of the case schedule; and c) stated Benefits' position regarding a discovery
dispute.  Def. Facts ¶ 40, Pl. Facts ¶ 40; Cohen Decl., Ex. R.[16]

On August 26, 2005, Feureisen faxed Hallinan additional recent correspondence
"as an update."  Def. Facts ¶ 41, Pl. Facts ¶ 41; Cohen Decl., Ex. Q; see also Cohen
Decl., Exs. O, P.  Feureisen included a copy of Republic's motion to bifurcate the
arbitration, as well as a letter from himself to the arbitrator's case manager opposing
Republic's motion to bifurcate the arbitration.  Pl. Facts ¶ 39; Cohen Decl., Ex. P.
Feureisen included a copy of an affidavit provided by one of Benefits' customers.  Cohen
Decl., Ex. P.  Feureisen also included a copy of a July 27, 2005 letter that Ronald
DeSoiza, an accountant hired by Benefits as an expert witness, sent to Feureisen,
discussing the issue of the valuation of Benefits' business.  Cohen Decl., Ex. O.[17]

On August 31, 2005, Feureisen faxed Hallinan a copy of the arbitrator's interim

---

[15] Hallinan does not cite to any relevant affidavits or testimony directly supporting this contention.

[16] The letter to the arbitrator referenced an attached letter from Ronald DeSoiza, an accountant whom
Benefits had hired as an expert witness. Cohen Decl., Ex. R, p. 3.  Republic avers that DeSoiza's letter was
attached to the fax to Hallinan, and was found in Hallinan's files.  Def. Facts ¶ 40.  Hallinan flatly denies
this.  Pl. Facts ¶ 40; Declaration of Charles Hallinan, November 8, 2006, at Stutzman Decl. Ex. C ¶ 13 ("I
am not aware of an affidavit of Ronald DeSoiza that set forth a theory of damages for the Benefits Express
case that was sent to me and none is in my files.").

[17] Republic avers that this letter was sent to Hallinan on July 27, 2005.  Def. Facts ¶ 39.  Hallinan denies
this, and avers that the letter was faxed on August 26, 2005.  Pl. Facts ¶ 39.  It appears that Hallinan is
correct, as the fax signature on the top of the letter reads "August 26, 2005."  Cohen Decl., Ex. O.

Hallinan admitted that he "knew that Benefits Express was going to be hiring an accountant to help testify
in its case against Republic Bank."  Deposition of Charles M. Hallinan, August 8, 2006, p. 17, at Cohen
Decl., Ex. X.  Republic argues that Hallinan's admission, and the aforementioned DeSoiza letter, indicates
that "Hallinan… participated in the discussion to hire DeSoiza."  Def. Facts ¶ 39.  Hallinan flatly denies
this, and Feureisen supports Hallinan's assertion.  See Declaration of Charles Hallinan, November 8, 2006,
at Stutzman Decl. Ex. C ¶ 13 ("I did not participate in any decision to hire any such expert for the Benefits
Express case."); Declaration of David Feureisen, November 7, 2006, at Stutzman Decl. Ex. D ¶ 10
("Charles Hallinan was never consulted on the selection of… potential experts in the Benefits Express
case.")

ruling of August 29, faxed to Feureisen on August 31.  Def. Facts ¶ 41, Pl. Facts ¶ 41;
Cohen Decl., Ex. S.  The interim ruling, inter alia, allowed Benefits to add the additional
cause of action and seek additional damages, resolved the discovery dispute between the
parties, bifurcated the arbitration, and set dates for the initial hearings.  Cohen Decl., Ex.
S.

Over the entire course of Benefits' litigation against Republic, Hallinan,
according to his own admission, paid $83,195.45 of Benefits' litigation costs.[18]  The
exact amount, timing, and nature of Hallinan's payments are unclear.[19]  However, it is
undisputed that the frequency and amount of Hallinan's payments increased after the
arbitrator's interim ruling of August 29 allowing Benefits to add an additional cause of
action.

On September 8, 2005, Hallinan wrote Kessler a check for $10,000 with the
memo line "arbitration expense."  Deposition of Charles M. Hallinan, August 8, 2006, p.
7, at Stutzman Decl., Ex. A-1.  On October 13, 2005, Hallinan Capital Corp. wrote a
check to Feureisen's law firm for $15,236.12, signed personally by Hallinan.  Cohen

---

[18] Def. Facts ¶ 36, citing Deposition of Charles M. Hallinan, August 8, 2006, p. 37, at Cohen Decl. Ex. X
(Q: "[I]s [$83,195.45] the amount then that you expended in furtherance of the [arbitration] brought by
Benefits Express against Republic?" A: "It certainly appears to be.").

[19] Hallinan admits that he "paid [litigation] costs from time to time at Kessler's request…"  Pl. Facts ¶ 42.
Hallinan avers that the first check he paid on behalf of the arbitration was September 8, 2005.
Memorandum of Plaintiff in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opposition"),
November 10, 2006, p. 5, citing Deposition of Charles M. Hallinan, August 8, 2006, p. 7, at Stutzman Decl.
Ex. A-1.  However, Feureisen's records contradict Hallinan's assertion.  On August 9, 2006, Feureisen
provided copies of "all the checks received by [his] firm for services rendered" in Benefits' litigation
against Republic.  Cohen Decl., Ex. Y.  As noted above, on June 14, 2004, Hallinan Capital Corp. made out
a check to Feureisen's law firm for $14,494.  Id.  On December 30, 2004, Hallinan Capital Corp. made out
a check to Feureisen's law firm for $7,118.57.  Id.

It is unclear, on the evidence before me, what Benefits' total litigation costs against Republic amounted to.
Thus, it is unclear what percentage of Benefits' costs were paid by Hallinan.  It is clear that Kessler paid at
least $13,000 to Feureisen towards the litigation, in three installments between June 19, 2003 and
December 31, 2003.  See Cohen Decl., Ex. Y (providing copies of checks from Kessler and Maria Kessler
to Feureisen's law firm).  There is no evidence before me that Kessler paid more than that.  If in actuality
Hallinan paid $83,195.45, and Kessler $13,000, then Hallinan would have paid over 86 percent of
Benefits' litigation costs.

However, it appears plausible that Hallinan may have actually paid more than the aforementioned
$83,195.45 towards Benefits' litigation.  If one adds the $10,000 payment to Kessler that Hallinan testified
to, the $13,500 payment to the AAA that Hallinan testified to, and the four checks provided from Hallinan
Capital Corp. to Feureisen's law firm, one reaches a total of $91,689.45.

It appears that Exhibit 11, referenced in Hallinan's deposition testimony of August 8, 2006, may provide a
more complete accounting of Hallinan's payments in furtherance of the Benefits litigation.  Republic's
counsel referred to Exhibit 11 at oral argument.  Unfortunately, Republic's counsel did not provide this
Exhibit to the Court with its motion for summary judgment.

Decl., Ex. Y.  On October 24, 2005, Hallinan wrote a check to the American Arbitration Association ("AAA") for $13,500.  Deposition of Charles M. Hallinan, August 8, 2006, p. 8-9, at Cohen Decl., Ex. X.  Republic alleges that this payment was for the purpose of paying the AAA's additional fee required to amend Benefits' petition.  Def. Facts ¶ 42.[20] Hallinan avers that it was unknown to him whether Benefits was required to pay an additional fee.  Pl. Facts ¶ 42.  On January 27, 2006, Hallinan Capital Corp. wrote a check to Feureisen's law firm for $31,340.76.  Cohen Decl., Ex. Y.

On March 24, 2006, the arbitrator issued an award in favor of Benefits Express in the amount of $374,314 (excluding interest).  Cohen Decl., Ex. K.  The arbitrator held, inter alia, that Republic had breached the 2001 fee-splitting agreement by failing to immediately implement the 90%/10% fee split.  Id.  The arbitrator rejected Republic's argument that the implementation of the 90/10 split was conditioned on Benefits' establishment of a reserve account.  Id.  The arbitrator held that Republic owed Benefits $275,624 for that breach.  Id.  The arbitrator also held that Republic and Benefits reached an agreement to sell Benefits' assets in 2003, that the sale was completed, that the sale was not the product of duress, and that Republic correspondingly owed Benefits an additional $98,690, comprising the net remaining owed amount of the purchase price.  Id. The award stated that it was "in full settlement of all claims and counterclaims submitted in this arbitration."  Id.

At some undetermined time after the issuance of the award, Kessler called

---

[20] Republic alleges that Kessler "forwarded the AAA's bill to Hallinan for payment."  Def. Facts ¶ 42. Republic supports this by citing to Hallinan's testimony regarding his prior payment to Kessler of $15,236.12 on October 13, 2005.  See Deposition of Charles M. Hallinan, August 8, 2006, p. 33, at Cohen Decl., Ex. X ("I may have received a bill from Mr. Kessler or Mr. Kessler may have indicated that that amount is due.  I believe I did receive one or two bills from Mr. Kessler…").  Although Hallinan's testimony indicates that it is plausible, following the parties' general practices, that Kessler forwarded the AAA's bill to Hallinan for payment, Republic cites no testimony, affidavits, or documentary evidence specifically supporting that Kessler forwarded the AAA's bill for $13,500 to Hallinan for payment.  Indeed, although Hallinan indicated in his testimony that "one or two bills" from Kessler were produced to Republic "as part of [his] file," Republic's counsel admitted at deposition that he "[hadn't] been able to locate them."  See Deposition of Charles M. Hallinan, August 8, 2006, p. 33, at Cohen Decl., Ex. X.

Additionally, although Republic cites to Hallinan's deposition testimony that he paid the $13,500 to the AAA, Republic does not cite to any testimony or affidavits indicating that Hallinan was aware that the AAA required an extra fee to amend a complaint, nor any documentary evidence that it was, in fact, the AAA's policy to require such a fee.  Def. Facts ¶ 42.

Hallinan to discuss the result.[21]  Def. Facts ¶ 47.

On September 20, 2006, Judge Scheindlin confirmed the arbitration award.  See Benefits Express, LLC v. Republic Bank & Trust Co., 2006 U.S. Dist. LEXIS 67911 (S.D.N.Y. 2006)

### d.  Hallinan's Instant Action

Hallinan brought the instant suit on January 11, 2006 (before the arbitrator had issued his award).  Hallinan's claims, as characterized by Hallinan's counsel, essentially boil down to this:  First, "Hallinan seeks recovery for Republic's breach of the 2001 agreement…"[22]  Pl. Opposition, at 2.  Hallinan, in his breach of contract claim, incorporates by reference allegations describing the events relating to the 1998 Benefits and Republic contract, the 2001 Overdraft Contract between Hallinan, Republic, and Benefits, the 2001 Capitalization Contract between Hallinan and Benefits, Hallinan's investments in Benefits, Republic's subsequent breaches of its agreement to pay overdraft fees, Republic's use of the reserve account, and Republic's 2003 purchase of Benefits. See generally Pl. Complaint.

Secondly, Hallinan seeks recovery "for the fraudulent statements (and omissions)" that led him to sign the 2001 Overdraft Contract and "to continue investing after November 2001."  Pl. Opposition, at 2.  This category of claims includes Hallinan's fraud, constructive fraud, and negligent misrepresentation claims.  As summarized by Hallinan's counsel, Hallinan alleges that Republic, when it signed the November 2001 contract, 1) represented that it would "pay Benefits immediately" "the overdraft fees to which [Benefits] was entitled" (i.e. 90%); 2) made "generalized assurances… that it would work towards [Benefits'] continued success; 3) "fail[ed] to disclose that it would

---

[21] Kessler stated in his deposition that he called Hallinan "after the arbitrator rendered his decision," but he did not state exactly when after the arbitrator's issuance of the award that he did so.  See Deposition of Barry Kessler, September 18, 2006, p. 20, at Cohen Decl., Ex. Y.  Hallinan stated in his deposition that his counsel, Andrew Stutzman, notified him about the arbitrator's decision before Kessler did, but Hallinan also did not state exactly when after the arbitrator's issuance of the award that Stutzman did so.  See Deposition of Charles Hallinan, June 6, 2006, p. 196, at Stutzman Decl., Ex. A-2.

Republic additionally alleges that Kessler did not call any other Benefits creditors besides Hallinan.  Def. Facts ¶ 47.  However, Hallinan points to Kessler's testimony that he had a "recollection of speaking to Peter [Brown, another Benefits creditor] on the subject of the proceeding."  See Deposition of Barry Kessler, September 18, 2006, p. 22, at Stutzman Decl., Ex. A-3.

[22] Hallinan does not appear to seek recovery for breach of the 2003 Agreement between Republic and Benefits, to which he does not appear to have been a party.  See Cohen Decl., Ex. D.

impose a 100% reserve for all Benefits Express overdrafts"; and 4) "omitted… that it planned to purchase [Benefits] and… intended to strong-arm Kessler… to force such a sale."  Pl. Opposition, at 19-20.  These misrepresentations and omissions, Hallinan alleges, induced him to invest $160,000 at the time of the 2001 Overdraft Contract, as well as an additional $200,000 over the ensuing years.  Pl. Opposition, at 21-22.

I denied Republic's initial motion to dismiss Hallinan's suit as barred by *res judicata* given Benefits' prior arbitration against Republic.  Hallinan v. Republic Bank & Trust Co., 2006 U.S. Dist. LEXIS 34875 (S.D.N.Y. 2006) ("Hallinan I").  Regarding the issue of claim preclusion, I held that on the record as it stood, "the fact that Hallinan defrayed some portion of Benefits' expenses is not sufficient to create privity between Hallinan and Benefits."  Hallinan I, 2006 U.S. Dist. LEXIS 34875, at *12.  In addition, I held that the record at that time did not support the contention that Hallinan exercised control over Benefits so much so that he used Benefits as his "alter ego."  Id.  I left open the possibility that issue preclusion might apply to issues decided by the arbitrator, and that additional discovery might show the extent to which Benefits represented Hallinan's interests.  Id. at *13-14.[23]  I also dismissed Hallinan's tortious interference claim.  Id. at *14-16.

## II.    STANDARD OF REVIEW

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986).  The moving party bears the burden of demonstrating the absence of a material factual question.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247. In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987).  However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment; the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be

---

[23] Discovery ended on October 1, 2006.

backed by evidence that would allow "a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

### III.    DISCUSSION

Republic argues that Hallinan's instant claims are barred by *res judicata* or collateral estoppel.  I will address each argument in turn.

A. *Res Judicata* (Claim Preclusion)

*Res judicata*, sometimes referred to as "claim preclusion," holds that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 284 (2d Cir. 2000).[24]  Thus, claim preclusion could serve to bar all of Hallinan's instant claims.  The burden is on the party seeking to invoke claim preclusion to prove that the doctrine is applicable. Computer Assocs. Int'l. Inc. v. Altai, Inc., 126 F.3d 365, 369 (2d Cir. 1997).  Claim preclusion doctrine applies with equal force to arbitral determinations.  See Pike v. Freeman, 266 F.3d 78, 90 (2d Cir. 2001).

Whether privity existed between Hallinan and Benefits at the time of Benefits' prior arbitration is the key inquiry here.  The doctrine of privity, in the context of claim preclusion, is shaped by fundamental notions of due process that mandate that "a person cannot be bound by a judgment without notice of a claim and an opportunity to be heard."  See Stichting ter behartiging van de belangen van oudaandeelhouders in het kapitaal van Saybolt Int'l B.V. v. Schreiber, 327 F.3d 173, 184 (2d Cir. 2003) ("Stichting"), citing Expert Electric, Inc. v. Levine, 554 F.2d 1227, 1233 (2d Cir. 1977). In general, a prior adjudication has preclusive effect on a nonparty to that adjudication only if that nonparty was represented in the prior proceeding by another "vested with the authority of representation," or if the nonparty exercised "some degree of actual control" over the presentation of the party's case in the proceeding. Stichting at 184-85; see also

---

[24] Claim preclusion differs from issue preclusion, discussed infra, in that it applies to claims asserted in a subsequent action that *could have been* raised in a prior action.  See Hallinan I, 2006 U.S. Dist. LEXIS 34875, at *7-8 (emphasis intact), citing Pike v. Freeman, 266 F.3d 78, 91.  See also Sassower v. Abrams, 833 F. Supp. 253, 265 (S.D.N.Y. 1993) ("[T]he functional difference between claim preclusion and issue preclusion is that while only the former can operate to prevent litigation of a matter that has never been decided, both prevent relitigation of an issue of fact or law that has already been necessarily decided as part of a valid, final judgment.") (citation omitted).

Ruiz v. Commissioner of Dep't of Transp., 858 F.2d 898, 903 (2d Cir. 1988) (under New York law, privity encompasses "those who control an action although not formal parties to it [and] those whose interests are represented by a party to the action…"), citing Watts v. Swiss Bank Corp., 265 N.E.2d 739, 743 (N.Y. 1970).  Republic argues both that Hallinan was "represented" by Benefits and exercised "control" over Benefits at the prior arbitration, thus establishing privity and barring his instant claims.

Before addressing each ground for privity in turn, I note that the question of privity is a fact-based determination of "substance, not mere form." Stichting at 186, citing Expert Electric, Inc. v. Levine, 554 F.2d 1227, 1233; see also Ruiz v. Commissioner of Dep't of Transp., 858 F.2d 898, 903 (noting that under New York law, "the concept of privity does not have a technical and well-defined meaning…"), citing Watts v. Swiss Bank Corp., 265 N.E.2d 739, 743.  "…[T]he relevant inquiry is the closeness of the relationship at the time of the prior proceeding." Stichting at 186.

i.   Hallinan's "Representation" At Prior Arbitration

Republic's first argument is that Hallinan was "represented" by Benefits at the prior arbitration and therefore Hallinan's instant claims are barred.  The Second Circuit has found privity based on "representation" to exist where a party to a previous suit was, at the time of the litigation, acting as either a "fiduciary or organizational agent" of the person against whom preclusion is asserted.[25]  Stichting at 185; see also Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 593 ("collateral estoppel can be applied to nonparties where the litigating party acted in a fiduciary capacity in protecting the nonparties' interest."), rehearing denied, 415 U.S. 986 (1974).[26]  However, there is "no

---

[25] The Second Circuit recognizes privity based on the theory of representation "only if the interests of the person alleged to be in privity were represented in the prior proceeding by another vested with the authority of representation."  Stichting at 185 (emphasis added, citations omitted).  In Stichting, the Second Circuit explained further that it has "thus found privity" [i.e., that a party is vested with the authority of representation] "where a party to a previous suit was, at the time of the litigation, acting as either a fiduciary or organizational agent of the person against whom preclusion is asserted."  Id. (citations omitted).

Thus, under prevailing Second Circuit law, it appears that a party's status as a fiduciary or organizational agent is a sufficient, but not necessary, condition for a finding of privity based on the theory of representation.

[26] See also Algie v. RCA Global Comm., Inc., 891 F. Supp. 839, 853-54 (S.D.N.Y. 1994), citing Restatement (Second) of Judgments § 41(1) ("A person is represented by a party who is: a) The trustee of an estate or interest of which the person is a beneficiary; or b) Invested by the person with authority to represent him in an action; or c) The executor, administrator, guardian, conservator, or similar fiduciary

bright line rule as to whether or not shareholders are in privity with their corporation for res judicata purposes." Amalgamated Sugar Co. v. NL Industries, Inc., 825 F.2d 634, 640 (2d Cir. 1987) ("Rather, a finding of privity between a shareholder and the corporation depends on whether, under the circumstances, the interests of the nonparty were adequately represented.")

The key inquiry here is whether Hallinan's interests were "adequately represented" by Benefits at the prior arbitration. On the evidence before me on summary judgment, it is a close call.  Essentially, it comes down to whether Hallinan had some independent interest in the outcome of the Benefits litigation that was not represented by virtue of his interest in the company.  The extent of his interest in the company, however, is disputed.

The 2001 Overdraft Contract explicitly refers to Hallinan as a "shareholder" of Benefits.  If Hallinan signed the 2001 Overdraft Contract as a "shareholder," his interests in recovering for breach of that contract are in all likelihood encompassed by his status as a "shareholder."[27]  Benefits, pursuant to its fiduciary duty to its majority shareholder, pursued its litigation against Republic; Hallinan's interests as a shareholder would have been represented by Benefits in that prior litigation; and presumably, as majority shareholder, Hallinan would have realized some recovery as part of Benefits' recovery.[28]

However, Hallinan avers that he was merely a "creditor" of Benefits, and that he was never a "shareholder."  Although Benefits management owes a fiduciary duty to its shareholders, it does not owe the same fiduciary duty to creditors.  See United States v. Moskowitz, 215 F.3d 265, 272 (2d Cir. 2000), citing United States v. Jolly, 102 F.3d 46, 48 (2d Cir. 1996) (distinguishing between duties owed to shareholder and creditors, noting, "[b]orrower-lender relationships are typically at arm's-length, and a firm's

---

manager of an interest of which the person is a beneficiary; or d) An official or agency invested by law with authority to represent the person's interests; or e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member."), aff'd, 60 F.3d 956 (2d Cir. 1995).

[27] Hallinan avers that his fraud, constructive fraud, and negligent misrepresentation claims should be considered as distinct from his breach of contract claim.  As discussed in Section C., infra, I am rejecting that argument and dismissing Hallinan's fraud claims and related claims as breach of contract claims in disguise.

[28] The extent of Hallinan's recovery, if any, from the prior Benefits litigation is unclear on the record before me.

obligations to creditors are generally regarded solely as contractual.")[29]  If Hallinan
signed the 2001 Overdraft Contract as a creditor of Benefits and was thus not owed a
fiduciary duty by Benefits, it is less likely that Benefits wholly represented Hallinan's
interests in the prior litigation and more likely that Hallinan may have some independent
interest in the 2001 Overdraft Contract.

Republic argues, correctly, that ascertaining Hallinan's exact legal status vis-à-vis
Benefits – shareholder, creditor, or equitable owner[30] – is not necessary to find Hallinan
in privity with Benefits.  See Monahan v. New York City Dep't of Corrections, 214 F.3d
275, 285 (privity "is a functional inquiry in which the formalities of legal relationships
provide clues but not solutions.").  Indeed, regardless of Hallinan's exact legal status,
Hallinan freely admitted his financial interest in the Benefits arbitration.  When referring
to the Benefits arbitration, Hallinan stated that he "would have hoped to have recovered
most if not all of [his] investment in the company," and that he "had $359,000 worth of
dogs in that fight."  See Deposition of Charles M. Hallinan, August 8, 2006, p. 63-64, at
Cohen Decl., Ex. X; Deposition of Charles M. Hallinan, June 6, 2005, p. 100, at Cohen
Decl., Ex. W.  Still, there exists a distinction between a financial interest in prior
litigation and being "represented" at prior litigation.  See Algie v. RCA Global Comm.,
Inc., 891 F. Supp. 839, 853-54 ("virtual representation requires either some form of
agreement by the non-party to permit the litigant in the first suit to represent him, or else
a relationship between them that demonstrates that the litigant was authorized to
represent and was in fact representing the legal interest of the non-party.").

On the record before me, resolving all ambiguities against the party moving for
summary judgment, and despite some nagging doubts of my own, I am unable to
conclude that Hallinan was a "shareholder" of Benefits as opposed to a creditor at the
time of the prior litigation.  Given the explicit language of the 2001 Overdraft Contract
referring to Hallinan as a "shareholder," Hallinan's blanket denials of "shareholder"

---

[29] Note, however, that "once a corporation enters the 'zone of insolvency,' the directors owe fiduciary
duties to the corporations' creditors, in addition to its shareholders."  See RSL Communs. PLC v. Bildirici,
2006 U.S. Dist. LEXIS 67548, at *26-27 (S.D.N.Y. 2006) (citations omitted).

[30] Republic argues in passing that Hallinan dominated and controlled the corporation Benefits to such an
extent that he should be considered an "equitable owner."  See Freeman v. Complex Computing Co., 119
F.3d 1044, 1051 (2d Cir. 1997), citing Guilder v. Corinth Constr. Corp., 235 A.D.2d 619 (N.Y. App. Div.
1997).  I rejected this argument on Republic's motion to dismiss.  I see no reason to accept it now based on
the evidence before me on summary judgment.

status produce some of those doubts.  Nonetheless, the fact is that Republic has provided no evidence that refutes Hallinan's denials beyond a genuine issue of material fact. Genuine issues of material fact remain as to the extent of Hallinan's interests in Benefits, including the effect of the 2001 Overdraft Contract and the 2001 Capitalization Contract, the intentions of the parties upon signing those contracts, and the effect of Hallinan's subsequent investments beyond his original $160,000 on his ownership interests in Benefits.

Thus, on the record before me, resolving all ambiguities against the party moving for summary judgment, I cannot conclude that Hallinan's interests were "represented" by Benefits at the prior arbitration to an extent sufficient to constitute privity and bar Hallinan from raising the instant claims.

ii.  "Some Degree of Actual Control" of Prior Arbitration

Republic's second argument in support of privity is that Hallinan exercised "some degree of actual control" over the presentation of Benefits' case at the prior Benefits proceeding, and thus his instant claims are barred.  See Stichting at 184-85, citing Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368-369 (2d Cir. 1995) (preclusion applies against person who serves in representative capacity to direct prior litigation); Ruiz v. Comm'r of Dep't of Transp., 858 F.2d 898, 903 (preclusion applies against person who "formulated an overarching strategy for the two actions"); see also Algie, 891 F. Supp. at 852 ("a purported controlling non-party must, at least, be able to decide what legal theories and evidence should be advanced in the first action and whether an appeal should be taken from an adverse decision.").

It is undisputed that the 2004 proposed settlement between Republic and Benefits was explicitly conditioned on Hallinan waiving his future claims, but he refused to waive those claims, thus sending the parties to arbitration.  It is undisputed that Hallinan paid for much, if not all, of Benefits' litigation costs from June 14, 2004 onward through the time of the arbitration.  It is undisputed that Hallinan was sent correspondence relating to the arbitration on several occasions, including analyses of facts, legal arguments, and claims before the arbitrator. It is also undisputed that Hallinan testified as a witness at the prior arbitration.

However, there is no evidence, beyond a genuine issue of material fact, that Hallinan ever exercised a degree of "actual control" over the presentation of Benefits' case during the prior litigation. There is no evidence that Hallinan directed Benefits or Benefits' counsel to pursue or not pursue certain of the claims being litigated. There is no evidence that Hallinan participated in Benefits' decision to hire an expert. There is no evidence that correspondence was sent to Hallinan for review or comment, as opposed to keeping him abreast of the litigation, in a sense preparing him as a witness and interested party. Hallinan and Benefits' counsel have submitted affidavits denying any allegations to the contrary, and Republic has put forth no evidence directly contradicting their denials beyond a genuine issue of material fact.

Republic's best argument in support of privity based on "actual control" is that Hallinan paid for a large majority of Benefits' litigation costs. However, Hallinan's payment of Benefits' litigation costs does not, in and of itself, establish an attorney-client relationship between Hallinan and Benefits' counsel sufficient to establish privity. See Moran v. Hurst, 32 A.D.3d 909, 911-12 (N.Y. App. Div. 2006) (attorney not liable for malpractice to third-party who paid attorney's fee on theory of privity). The dispositive inquiry is Hallinan's "actual control" of the Benefits litigation, of which no undisputed evidence exists at this point in time.

It is certainly plausible that Hallinan may have substantively directed the Benefits litigation. If such evidence were to emerge at trial, nothing prevents Republic from moving at the close of all the evidence for judgment based on *res judicata* grounds. However, on the record before me, resolving all ambiguities against the party moving for summary judgment, I cannot conclude that Hallinan exercised "some degree of actual control" over the prior Benefits litigation to an extent sufficient to constitute privity and bar Hallinan from raising all his instant claims.

B. Collateral Estoppel (Issue Preclusion)

Collateral estoppel, sometimes referred to as "issue preclusion," holds that a "judgment in a prior proceeding bars a party and its privies from relitigating an issue if… (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a

valid and final judgment on the merits." <u>Stiching</u>, 327 F.3d 173, 180 n.2.  Collateral
estoppel, like claim preclusion, applies with equal force to arbitral proceedings.  <u>See</u>
<u>Beatus v. Gebbia</u>, 4 F.Supp.2d 256, 260 (S.D.N.Y. 1998).

     Republic argues that issue preclusion bars Hallinan from relitigating the issues
that were actually litigated and decided in the Benefits arbitration in Republic's favor,
namely that Republic and Benefits reached an agreement to sell Benefits' assets in 2003,
that the sale was completed, and that the sale was not the product of duress.  Conversely,
Republic admits that issue preclusion would apply against it regarding the issues that
were actually litigated and decided in the Benefits arbitration in Benefits' favor, namely,
that Republic had breached the 2001 Overdraft Contract by failing to immediately
implement the 90%/10% fee split.  <u>See</u> Defendant's Memorandum In Support of Motion
for Summary Judgment, p. 15.

     Privity between Hallinan and Benefits is, as with claim preclusion, the key inquiry
as to whether issue preclusion bars Hallinan's claims.  Because, as explained above,  I
cannot conclude on the present record that Hallinan and Benefits were in privity at the
time of the Benefits litigation, I cannot conclude on summary judgment that issue
preclusion bars Hallinan's claims regarding the 2003 sale of Benefits' business.

     However, this determination is irrelevant to Hallinan's instant claims.  Hallinan
brings his breach of contract claim pursuant only to the 2001 Overdraft Contract, and not,
as Benefits did, pursuant to either the 2003 Agreement between Republic and Benefits
providing for the sale of Benefits, or the 1998 Agreement establishing the relationship
between Republic and Benefits.  (Hallinan was not a party to either of the latter two
Agreements.)  There is no language in the 2001 Overdraft Contract appearing to provide
Hallinan grounds to proceed against Republic on his breach of contract claim for its
actions regarding the 2003 sale, nor does Hallinan, in his complaint, cast his allegations
regarding the 2003 sale as breaches of the 2001 Overdraft Contract.[31]

     Issue preclusion does apply, however, against Republic regarding Hallinan's

---

[31] It is true that Hallinan incorporates by reference in his breach of contract claim the allegations in his
Complaint regarding the 2003 sale.  However, to the extent that Hallinan makes allegations regarding the
2003 sale of Benefits to Republic, his allegations appear relevant only to his claims of fraud, constructive
fraud, and negligent misrepresentation, in that Hallinan alleges that Republic concealed its intentions
regarding the 2003 sale at the time of the signing of the 2001 Overdraft Contract.  As discussed <u>infra</u>, I am
dismissing Hallinan's fraud, constructive fraud, and negligent misrepresentation claims on alternate
grounds.

claim against Republic for breach of the 2001 Overdraft Contract for failing to immediately implement the 90%/10% fee split.  As Republic acknowledges, the issues are identical, the arbitrator actually decided the issues, in a manner necessary to support the judgment, and Republic clearly had a full and fair opportunity to litigate the issues at the prior arbitration.  Thus, Republic is estopped from arguing that it did not breach the 2001 Overdraft Contract between it, Benefits, and Hallinan.

Because Hallinan's claim for breach of the 2001 Overdraft Contract is all that remains in this litigation, <u>see</u> Section C., <u>infra</u>, and the issue of Republic's breach of that contract is settled, this case will now move forward to a trial solely on the damages Republic owes to Hallinan as a result of its breach of the 2001 Overdraft Contract.  At that trial, it will be determined what Hallinan is owed separately as a result of Republic's breach, as distinct from what Benefits recovered in its prior litigation.  To resolve that issue, it will undoubtedly be necessary to ascertain what Hallinan may already have recovered from Benefits' recovery from Republic, due to Hallinan's shareholder's or creditor's interest in Benefits – and ultimately, the exact nature of Hallinan's interest itself.

I note that on December 22, 2006, I granted Republic's motion to amend its answer for the purpose of interpleading Benefits into this case, pursuant to Fed. R. Civ. P. 22.  Undoubtedly, Benefits' presence in this litigation will help to resolve the issue of what Republic owes Hallinan, as distinct from Benefits, as a consequence of its breach of the 2001 Overdraft Contract, and help to avoid any issues of "double recovery" against Republic or for Hallinan.

C.   <u>Fraud Claims and Related Claims</u>

Hallinan additionally brings fraud, constructive fraud, and negligent misrepresentation claims, based on Republic's alleged "fraudulent statements (and omissions)" that led Hallinan to sign the 2001 Overdraft Contract and to continue investing thereafter.  Republic argues in essence that Hallinan's fraud and misrepresentation claims are merely restatements of his contract claims and thus fatally defective as a matter of law.  I agree.

"The well accepted rule is that a cause of action for fraud does not arise when alleged fraud relates to a breach of contract." <u>Crabtree v. Tristar Automotive Group, Inc</u>.,

776 F. Supp. 155, 162 (S.D.N.Y. 1991).  However, "a cause of action for fraud in the inducement will lie when 'a contractual promise [is] made with the undisclosed intention not to perform it.'"  Carruthers v. Flaum, 450 F. Supp. 2d 288, 2006 U.S. Dist. LEXIS 64684, at *69 (S.D.N.Y. Sept. 6, 2006), citing Sabo v. Delman, 143 N.E.2d 906 (N.Y. 1957).  The distinction turns on whether the allegedly fraudulent promise was "collateral" to the contract – i.e., a "promise to do something other than what is expressly required by the contract."  See Frontier-Kempier Constructors Inc. v. Am. Rock Salt Co., 224 F. Supp. 2d 520, 528 (W.D.N.Y. 2002).  "[A] representation that performance will be made, even if only implied through the negotiation process, is not distinct from the contract." Crabtree v. Tristar Automotive Group, Inc., 776 F. Supp. 155, 163.  However, "an exception to this rule exists if the promise made was a representation of present fact, not of future intent."  Id.

Hallinan's fraud allegations, as he characterizes them, are representations of future intent to perform the 2001 Overdraft Contract, rather than misrepresentations of present fact collateral to the contract.  Hallinan, as summarized by his counsel, first alleges that Republic, when it signed the November 2001 contract, represented that it would "pay Benefits immediately" "the overdraft fees to which [Benefits] was entitled" (i.e. 90%).  Secondly, Hallinan alleges that Republic made "generalized assurances… that it would work towards [Benefits'] continued success.  Pl. Opposition, at 19-20. Hallinan characterizes these misrepresentations as "collateral" to the contract.  However, both these alleged misrepresentations fit squarely within the category of promises of future intent to perform the contract, rather than misrepresentations of collateral present fact.  See Crabtree v. Tristar Automotive Group, Inc., 776 F. Supp. 155, 162-63 (defendants' representations at contracting that they would honor their obligations under stock purchase agreement, e.g. to pay for plaintiff's stock at agreed-upon price and to operate plaintiff's businesses profitably, do not support separate fraud claim).

Hallinan also alleges that Republic "fail[ed] to disclose that it would impose a 100% reserve for all Benefits Express overdrafts" and "omitted… that it planned to purchase [Benefits] and… intended to strong-arm Kessler… to force such a sale."  Pl. Opposition, at 19-20.  Hallinan characterizes these nondisclosures as "collateral" to the contract.  However, the first alleged nondisclosure is more accurately an alleged failure to

perform Republic's explicit contractual duties regarding the Benefits reserve.  The second alleged nondisclosure is at best an alleged failure to perform Republic's generalized duty to "work towards Benefits' continued success."  Neither alleges a misrepresentation of collateral present fact.[32]  See Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1294 (S.D.N.Y. 1989) (conduct allegedly breaching contract does not support separate fraud claim).

Hallinan further alleges that because he invested an additional $200,000 over the ensuing years, as well as the original $160,000 at the time of the 2001 Overdraft Contract, that his additional investment supports an additional claim of fraud.  Pl. Opposition, at 21-22.  However, the 2001 Overdraft Contract between Benefits, Republic, and Hallinan explicitly provides that "Hallinan shall fund the company with adequate capital as needed in Hallinan's judgment to ensure its continued operation and growth."  Cohen Decl. Ex. C.  Hallinan's additional investment appears to be squarely within the subject matter of the contract, and thus Hallinan's avenue for recovery of those monies lies in contract.  Further, Hallinan does not state any additional specific misrepresentations, apart from the alleged misrepresentations and nondisclosures at contracting, to support additional fraud claims.  Even if he did, subsequent assurances of performance implicit in contracting do not support a separate fraud claim distinct from a breach of contract claim.  See Metropolitan Transp. Authority v. Triumph Advertising Productions, Inc., 116 A.D.2d 526, 528 (N.Y. App. Div. 1986); see also Vista Co. v.

---

[32] Even were these alleged failures to disclose construed liberally as "failures to disclose material fact," to be actionable as fraud, a duty of disclosure must have existed.  Frontier-Kempier Constructors Inc. v. Am. Rock Salt Co., 224 F. Supp. 2d 520, 529.  "New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."  Id. (citation omitted).  "On the other hand, '[a] duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well.'"  Id. (citations omitted).

Hallinan's theory here is that Republic was acting upon superior (factual) knowledge, and knew that Hallinan would rely upon that knowledge.  Republic counters that the topics the parties discussed during negotiations were explicitly referenced in the contract.  For example, it is difficult to see how Republic had superior knowledge regarding the reserve requirement when the parties, including Hallinan, specifically inserted a reserve requirement into the contract.  Because Hallinan and Republic dealt at "arm's length" in their negotiations, Republic owed no duty of disclosure to Hallinan and Hallinan cannot state a fraud claim based on nondisclosure.  See Frontier-Kempier Constructors Inc. v. Am. Rock Salt Co., 224 F. Supp. 2d 520, 531.

Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1294 (alleged concealment which took place after execution of contract is conduct breaching contract and does not support separate fraud claim).

Hallinan's constructive fraud and negligent misrepresentation claims suffer from the same defect as his fraud claim.  The elements of constructive fraud in New York are the same as those of fraud, except that the element of scienter is replaced by the element of a fiduciary relationship between the parties.  Petrello v. White, 412 F. Supp. 2d 215, 229 (S.D.N.Y. 2006); see also Sudul v. Computer Outsourcing Servs., 868 F. Supp. 59, 63 (S.D.N.Y. 1994).  The elements of negligent misrepresentation in New York are the same as those of fraud, except that the element of scienter is missing.  See Mackinder v. Schawk, Inc., 2005 U.S. Dist. LEXIS 15880, at *34-35 (S.D.N.Y. 2005).[33]  There is no reason why Hallinan's allegations should support a constructive fraud claim or negligent misrepresentation claim when they do not support a fraud claim.[34]  See Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1294 (dismissing both constructive fraud claim and fraud claim as restatements of contract claim); Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 195-96 (2d Cir. 2001) (dismissing both negligent misrepresentation claim and fraud claim as restatements of contract claim).

In short, because Hallinan's fraud, constructive fraud, and negligent misrepresentation claims are essentially breach of contract claims in disguise, I am dismissing all three claims.

## IV.   CONCLUSION

I am dismissing Hallinan's claims for fraud, constructive fraud, and negligent misrepresentation.  Hallinan's remaining claim for breach of the 2001 Overdraft Contract will proceed to trial, on the issue of damages only, consistent with the above reasoning of this Opinion.

---

[33] A claim for negligent misrepresentation also requires the existence of a legal duty independent of the contract.  Mackinder v. Schawk, Inc., 2005 U.S. Dist. LEXIS 15880, at *35.

[34] Additionally, Hallinan has not proven the existence of a fiduciary relationship between himself and Republic.  See note 31, supra.

The Clerk of the Court is instructed to close this motion and remove it from my docket.

**SO ORDERED.**
**January** 2, **2007**
**New York, New York**

**U.S.D.J.**